UNITED STATES of America

v.

Allen M. DORFMAN, Roy L. Williams, Joseph Lombardo, Thomas F. O'Malley, and Andrew G. Massa, also known as Amos Massa, Defendants.

No. 81 CR 269.

United States District Court,
N. D. Illinois, E. D.

Dec. 9, 1981.

Douglas .P. Roller, Gary S. Shapiro, Mark J. Vogel, Asst. U. S. Attys., Dan K. Webb, U. S. Atty., Chicago, Ill., for plaintiff.

Albert E. Jenner, Jr., Jenner & Block, Chicago, Ill., Thomas A. Wadden, Wadden, Scherr, Krebs & Gitner, Washington, D. C., George J. Cotsirilos, Harry J. Busch, Chicago, Ill., William G. Hundley, Hundley & Cacheris, Washington, D. C., Sherman C. Magidson, Chicago, Ill., for defendants.

## MEMORANDUM ORDER

MARSHALL, District Judge.

Defendants in this case are charged in an eleven count indictment with conspiring to commit bribery, travel in interstate commerce with intent to commit bribery, and wire fraud. Count I charges the defendants with conspiring to bribe United States Senator Howard Cannon in order to obtain a favorable disposition on pending legislation involving deregulation of the trucking industry by securing for him the right to purchase certain property owned by the Central States, Southeast and Southwest Areas Pension Fund ("Fund") of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America. Count II charges the defendants with attempting to carry out that scheme. Counts III through XI charge defendants with nine separate wire fraud violations for attempting to defraud the Pension Fund of the loyal services of two of the defendants, and attempting to obtain money and property by false pretenses.

Defendants have filed numerous motions to dismiss all or part of the charges against them. They claim in various motions, apparently missing the irony of their position, that the indictment fails to state any claim against them; that it is too vague to permit them to understand the nature of the charges; that it states two claims in each of nine counts and is thereby "duplicitous"; and that it states the same claim in a number of different counts and is thereby "multiplicious". The government filed one consolidated response to these four motions. We treat each of them separately in this opinion.

Defendants have also filed a number of motions for dismissal of the indictment on the grounds of government misconduct. In

this opinion we address defendants' motions to dismiss because of pre-indictment delay, for failure to present exculpatory evidence to the grand jury, and because of violations of the federal wiretap statute, breach of grand jury secrecy, and government-generated pre-indictment publicity.

## I

■ Defendants claim that paragraph 2(a) of Counts III through XI of the indictment fails to state an offense under the wire fraud statute, 18 U.S.C. § 1343 (1976). The indictment charges that defendants engaged in a "scheme and artifice" designed to deny the Fund and its pensioners of their right to the conscientious, loyal and faithful services of defendants Thomas F. O'Malley ("O'Malley") and Amos Massa ("Massa"). Both parties agree, and the law is clear, that in order to state a wire fraud offense of this type the government must allege four elements: (1) the existence of a fiduciary duty; (2) a scheme or plan to breach that duty; (3) a specific intent to defraud the party to whom the duty is owed; and (4) use of the wires in furtherance of that scheme. Defendants' Joint Memorandum in Support at 3; Government's Consolidated Response at 11.

■ It is well settled, and defendants admit, that a scheme designed to cause the loss of intangible rights or benefits, including the loyal service of an employee, is actionable under the wire fraud statute. See United States v. Von Barta, 635 F.2d 999 (2d Cir. 1980); United States v. Bohonus, 628 F.2d 1167 (9th Cir.), cert. denied, 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980); United States v. Bush, 522 F.2d 641, 648 (7th Cir. 1975), cert. denied, 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976); United States v. George, 477 F.2d 508, 510 (7th Cir.), cert. denied, 414 U.S. 827, 94 S.Ct. 49, 38 L.Ed.2d 61 (1973). Defendants contend, however, that there is no fiduciary duty owed by defendants O'Malley and Massa to the Fund and that, if there were, it was not breached nor was any fraud committed.

We are obliged, on these preliminary motions, to treat the allegations in the indictment as true and construe all the facts in the light most favorable to the government. Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 332 n. 16, 96 L.Ed. 367 (1953); Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1941); Von Barta, 635 F.2d at 1002. Given this posture, it is apparent that the defendants' motion is not well founded.

Defendant O'Malley is a Fund trustee and as such owes a fiduciary duty to the Fund under common law, the ERISA statute, 29 U.S.C. §§ 1102, 1103 (1976), and the separate agreement between the Fund and Victor Palmieri and Co. ("Palmieri"). See Defendants' Exhibit A. Defendants claim that the agreement with Palmieri relieved O'Malley and Massa of any duty they had with respect to the Fund's assets. We have examined the agreement and find that it in no way abrogates O'Malley's duty to act in the Fund's best interest. In fact, if the agreement has any effect, it appears to heighten the trustee's obligation not to interfere in the process of distribution of the Fund's assets. The trustees, under the agreement, maintain their responsibility for compliance with ERISA and monitoring the performance of the investment manager. Defendants' Exhibit A at 3. It is a fallacious argument for defendants to contend that because the Fund established an independent manager to distribute its real estate and other holdings, the Trustees were free to ignore their fiduciary duties to the Fund and interfere with that manager's best efforts to accomplish its function.

■ Defendant Massa is an employee of the Fund and a former trustee. The legal standard for determining his duty to the Fund depends on a variety of facts establishing the nature of his relationship with his employer. Von Barta, 635 F.2d at 1007; United States v. Brown, 540 F.2d 364, 375 (8th Cir. 1976); Bush, 522 F.2d at 652. This is a factual question requiring evidence at trial and not resolvable on a motion to dismiss the indictment.

The same is true of the defendants' argument that there was no breach of the fiduciary duty. Defendants are wrong in asserting that "absent some harm actually occurring to the beneficiary of a trust there is no breach of trust by the trustee" for purposes of the wire fraud statute. The alleged plan to deprive the Fund of faithful service—the scheme to defraud it of O'Malley's and Massa's loyalty—constitutes an offense under the wire fraud statute *regardless* of whether there was any eventual financial loss to the Fund. *See United States v. Bronston*, 658 F.2d 920, 927 (2d Cir. 1981); *United States v. Keane*, 522 F.2d 534, 546 (7th Cir. 1975), *cert. denied*, 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976); *United States v. Bryza*, 522 F.2d 414 at 422; *George*, 477 F.2d at 510.

Finally, defendants argue that a mere breach of fiduciary duty, without more, does not rise to the level of a criminal violation. *See Bush*, 522 F.2d at 648. The statement is true enough; however, here the government has alleged failure to disclose material information and affirmative conduct designed to deprive the Fund of relevant information which makes the breach a criminal act. *See Bronston*, 658 F.2d at 926; *Von Barta*, 635 F.2d at 1006; *Bush*, 522 F.2d at 648. Specifically, the indictment charges them with trying to purchase the property in question for Senator Howard Cannon, causing third parties to withdraw their bids on the property, failing to disclose the involvement of O'Malley and Massa in each of the above, and failure to disclose the involvement of defendant Allen Dorfman in the proposed purchase.

Defendants argue that there is no allegation that the information withheld was material, that Palmieri had a right to it, or that defendants did anything wrong in withholding it. Defendants' Memorandum in Support at 15. That interpretation is simply incorrect. The government has clearly alleged defendants' position giving rise to a fiduciary duty which was breached by the actions described above. What defendants are really asking is for this court to hold as a matter of law that none of this information was material to Palmieri's decision of how to dispose of the property. Again, this is a factual question not susceptible to resolution at this time. We leave to the government its opportunity to prove the breach of a legal duty and the materiality of information withheld. If the government fails to establish either the relationship it has alleged, the materiality of the information withheld, or defendants' actions in concealing that information, defendants can request a verdict at that time. At this stage it is clear that the indictment states an offense in paragraph 2(a) of Counts III through XI.

II

Defendants also attack Counts III through XI of the indictment on the ground of "vagueness". They submit that "after a thorough reading of the indictment" they are unable "to reasonably know or understand the precise nature and scope of the charges against them", thereby violating their fifth and sixth amendment rights. In addressing this argument, we treat separately paragraphs 2(a) and 2(b) of the counts in question.

The requirement that an indictment be reasonably specific stems from two constitutional guarantees: the fifth amendment right to indictment by grand jury and the sixth amendment requirement that defendants be informed of the charges against them. *United States v. Hinkle*, 637 F.2d 1154, 1157 (7th Cir. 1981). "The indictment must adequately apprise a defendant of the charges against him so that he can prepare a defense. Furthermore, it must establish a record that shows when a defense of double jeopardy may be available in the event future prosecutions are brought against him." *Id. See Russell v. United States*, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *United States v. Cecil*, 608 F.2d 1294 (9th Cir. 1979); *United States v. Wabaunsee*, 528 F.2d 1 (7th Cir. 1975). In general, an indictment is sufficient if it tracks the language of the statute which creates the offense, provided that the words

of the statute set forth all of the elements necessary to constitute the crime. *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974). *See also United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 636, 62 L.Ed.2d 575 (1980); *United States v. Hinkle, supra; United States v. Minick*, 636 F.2d 181, 184 (7th Cir. 1980).

■ Defendants are charged in Counts III through XI with violating the federal wire fraud statute, 18 U.S.C. § 1343 (1976), and each of the nine counts alleges a different specific wire transmission as a separate offense. But the telephone transmissions do not constitute an offense in and of themselves; the offense is dependent on the underlying fraudulent scheme which must also be alleged with sufficient particularity to inform defendants of the charge made against them. *See United States v. Charnay*, 537 F.2d 341, 352 (9th Cir.), *cert. denied*, 429 U.S. 1000, 97 S.Ct. 527, 50 L.Ed.2d 610 (1976); *United States v. Curtis*, 506 F.2d 985, 989–90 (10th Cir. 1974); *United States v. Mandel*, 415 F.Supp. 997, 1015–16 (D.Md.1976), *aff'd by an equally divided court*, 602 F.2d 653 (4th Cir. 1979) (en banc) (per curiam), *cert. denied* 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980); *United States v. DeSapio*, 299 F.Supp. 436, 445–46 (S.D.N.Y.1969).[1]

■ It should be apparent from what we have said in section I of this opinion, that paragraph 2(a), alleging a scheme to defraud the Fund of the loyal services of O'Malley and Massa, is not fatally vague. The indictment does far more than simply mirror the language of the wire fraud statute prohibiting interstate transmissions in furtherance of any "scheme or artifice to defraud", *see* 18 U.S.C. § 1343; it specifically refers to the victim of the fraud (the Fund), the nature of the scheme (to deprive the Fund of the loyal services of two named defendants), and the manner and means by which the fraud was to be carried out (specific conversations with the object of causing bids on Fund assets to be withdrawn and withholding material information from the Fund's managers). Thus, this part of the indictment is fundamentally different from those cases cited by the defendants in which indictments have been dismissed because, in merely reciting the language of the statute, they failed to allege an essential element of the crime, or failed to indicate the facts underlying the charge. *See e.g., United States v. Cecil; United States v. Keith*, 605 F.2d 462 (9th Cir. 1979); *United States v. Curtis.*

■ Paragraph 2(b), however, presents more serious problems. It states simply that defendants engaged in a "scheme or artifice * * * [t]o obtain money and property by means of fraudulent pretenses and representations." Indictment, Count III, ¶ 2. The final paragraph of each count includes a specific interstate wire transmission "for the purposes of executing" the scheme. *Id.* It does not allege any facts detailing who the victim of the alleged fraud was, what property is referred to, or how the property was to be obtained. Standing alone, the paragraph clearly would not meet the constitutional requirements of fair notice of the facts underlying the charge.[2] *Russell v. United States*, 369 U.S. at 765–66, 82 S.Ct. at 1047–48; *see also Curtis; Mandel; DeSapio*. But we do not judge the sufficiency of the indictment by the details of the charging paragraph alone; "in evaluating the sufficiency of an indictment, common sense and reason prevail over technicalities." *United States v. Climatemp, Inc.*, 482 F.Supp. 376, 382 (N.D.Ill.1979). The indictment must be

---

1. The government, in its response to defendants' motion to dismiss on vagueness grounds, maintains the curious position that the indictment need do no more than allege that the defendants committed some "fraud" or "scheme to defraud", without indicating any of the underlying facts, to be sufficient under the wire fraud statute. Government's Consolidated Response at 12, n. 1. The cases cited here demonstrate that their position is clearly in error.

2. We note that Fed.R.Crim.P. 58, Form 3, is illustrative of an appropriate indictment under the wire and mail fraud statutes. The Form contains the essential details of the fraudulent scheme in the charging paragraph.

viewed as a whole to determine if adequate notice of the fraudulent scheme is presented. *See United States v. Strauss*, 452 F.2d 375, 379 (7th Cir. 1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1252, 31 L.Ed.2d 455 (1972); *United States v. Climatemp*, 482 F.Supp. at 382; *United States v. Dorfman*, 335 F.Supp. 675, 678 (S.D.N.Y.1971).

■ In construing the indictment we are mindful of the fact that the government is not required to present a model indictment in every case, nor must it provide all the details of the offense in the charging papers. *United States v. Conlon*, 628 F.2d 150, 155–56 (D.C.Cir.1980).

> The true test of the sufficiency of an indictment is not whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, ["] and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.["] *Cochran and Sayre v. United States*, 157 U.S. 286, 290 [15 S.Ct. 628, 630, 39 L.Ed. 704], . . .; *Rosen v. United States*, 161 U.S. 29, 34 [16 S.Ct. 434, 435, 40 L.Ed. 606]. *United States v. Debrow*, 346 U.S. 374, 376 [74 S.Ct. 113, 114, 98 L.Ed. 92] (1953) (*quoting Hagner v. United States*, 285 U.S. 427, 431 [52 S.Ct. 417, 419, 76 L.Ed. 861] (1931)).

*See generally, Russell* 369 U.S. 763–64, 82 S.Ct. at 1046–47.

■ Reading the entirety of the indictment in conjunction with paragraph 2(b), there can be little doubt that the defendants have been sufficiently apprised of "what [they] must be prepared to meet" at trial. The victim of the scheme to "obtain money and property by means of fraudulent pretenses" is clearly the Pension Fund, and the property in question is equally clearly Wonderworld. Paragraphs 8

through 10 of Count I, incorporated by reference in the subsequent counts, identifies Victor Palmieri, Inc. as managing agent of the Fund, and describes Wonderworld as property owned by the Fund which Palmieri was attempting to sell. Paragraph 3 of Counts III through XI indicates that part of the scheme was to obtain an exclusive right to purchase that property at a specified price for Sen. Howard Cannon, *id.* at ¶ 3, and the rest of the supporting paragraphs allege that defendants interfered with attempts by other parties to bid on that same property, *id.* at ¶ 4. The indictment, therefore, while it is by no means a model for future use, adequately informs the defendants of the charges they must be prepared to meet at trial and satisfies the requirements of the fifth and sixth amendments.

■ We note additionally, that while a bill of particulars cannot cure a fatally vague indictment, *see Russell*, 369 U.S. at 770, 82 S.Ct. at 1050, an indictment which meets the minimum requirements of the Constitution can be supplemented by a bill of particulars to avoid any risk to defendants of surprise at trial. *See Mandel*, 415 F.Supp. at 1016; *Dorfman*, 335 F.Supp. at 679. In this case, the government has provided information in response to defendants' motion for a bill of particulars which answers some of the questions posed by defendants in their vagueness claim, and we have ordered that additional information be provided. It is also appropriate to note that defendants have been granted extensive discovery of the government's case. *Id.* Thus, while we do not condone the practice of minimal indictment drafting,[3] we are confident that defendants are in no danger of being deprived "of the significant protections which the guaranty of a grand jury indictment was intended to confer." *Russell*, 369 U.S. at 763, 82 S.Ct. at 1047.

### III

Defendants next contend that Count I, charging a conspiracy to bribe Senator

---

**3.** We adopt, on this subject, the statement of Judge Bazelon in *United States v. Conlon*, 628 F.2d at 155 n.31.

Howard Cannon, and Counts III through XI, alleging nine separate wire fraud violations, are multiplicious and therefore the government should be compelled to elect between them. We disagree.

Defendants' motion is based on the following rationale: "In the case at bar, the wire fraud violation alleged in Counts III through XI depend on the proof of the elements contained in Count I.... The gist of the crimes alleged in [these counts] is the conspiracy to bribe Senator Cannon by obtaining for him the exclusive right to purchase the Wonderworld property." Defendants' Joint Memorandum in Support at 10–11. Thus, defendants claim they are being charged twice in one indictment for the same crime. Were this the case we would be compelled to give this motion greater consideration; as the indictment stands, defendants' assertion is simply not accurate.

These counts allege two completely separate offenses.* While the evidence of each may overlap, the crimes charged are distinct and what the government must prove to establish each is poles apart. As our previous discussion indicates, Counts III through XI allege a plan to defraud the Fund of the loyal services of O'Malley and Massa. The government need establish a fiduciary duty, breach with intent to defraud, and material concealment to prove this offense. It is of no moment whether there is a shred of evidence that defendants attempted to bribe a United States Senator to prove this offense. Similarly, the charge

of conspiracy to bribe a United States Senator in violation of 18 U.S.C. § 371, is entirely separate from the wire fraud counts. The government could fail to prove a single element necessary to establish the scheme to defraud the Fund and still prove beyond a reasonable doubt that defendants attempted to bribe Senator Cannon.

 The basis for defendants' claim is that all of these charges arise out of a "single scheme" and are supported by allegations of the same "overt acts" in the indictment. However, the Supreme Court held years ago, in a slightly different but closely related context,[4] that it is not material that the overt acts charged to support two separate offenses are the same. *See Pinkerton v. United States*, 328 U.S. 640, 644, 66 S.Ct. 1180, 1182, 90 L.Ed. 1489 (1946). The criteria for examining a claim of multiplicity is whether the substantive offenses charged must be supported by different proof. *See United States v. Aleman*, 609 F.2d 298, 307 (7th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Kirby*, 587 F.2d 876, 881–82 (7th Cir. 1978); Cf. *United States v. Makres*, 598 F.2d 1072, 1078–79 (7th Cir. 1979) (applying same test to claim of double jeopardy). Here, as we have said, the necessary proof of a conspiracy to bribe and proof of a scheme to defraud the Fund, are largely independent. There is no rule of law that when a single conspiracy has as its objective two separate criminal offenses the government is compelled to elect which one it will prosecute.[5]

---

* For purposes of this discussion we refer to Counts III through XI alleging nine separate wire fraud violations, as one crime and the conspiracy to commit bribery charge in Count I as another. Defendants do not argue that Counts III through XI are multiplicious of each other, only that they overlap the conspiracy charged in Count I.

4. The *Pinkerton* decision upheld the practice of bringing a conspiracy charge simultaneously with a charge on the substantive offense. We recognize that defendants' argument here is that the indictment charges two offenses from the same conspiracy. But the notion that it is immaterial of the same overt acts are alleged in support of two criminal charges applies equally where, as here, the conspirators are alleged to

have as their objective two separate and independent criminal acts.

5. Defendants argue that Congress did not intend to permit simultaneous prosecutions under §§ 371 and 1343 where the wire fraud is simply an extension of the attempt to bribe a government official. What defendants have overlooked, however, is that Counts III through XI do *not* depend on the conspiracy alleged in Count I. They allege the wholly distinct crime of attempting to defraud the pension fund which, as a legally sufficient allegation, is in no way related to or dependent on the conspiracy and attempted bribery counts. Thus, we need not consider whether, in an appropriate case, wire fraud charges can be added to a § 371

## IV

■ Defendants' final argument is that Counts III through XI are fatally defective because they are "duplicitous." Duplicity is the joining in a single count of two or more separate and distinct offenses. *See United States v. Pavloski*, 574 F.2d 933, 936 (7th Cir. 1978); *United States v. Orzechowski*, 547 F.2d 978, 986 (7th Cir.), *cert. denied*, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977); *United States v. Zeidman*, 540 F.2d 314, 316 (7th Cir. 1976). Duplicitous indictments are prohibited because they make it difficult for a defendant to plead double jeopardy in a subsequent prosecution, they risk prejudice with respect to evidentiary rulings during trial, and they make it difficult to ensure a unanimous jury verdict. *See United States v. Murray*, 618 F.2d 892 (2d Cir. 1980); *Pavloski*, 574 F.2d at 316; *United States v. Starks*, 515 F.2d 112 (3d Cir. 1975).

■ Defendants focus in particular on the fact that where more than one offense is charged in a single count, there is a danger that some members of the jury will find defendants guilty on one part of the charge and other jurors will find defendants guilty of a second part of the charge, thus depriving them of their right to a unanimous verdict. They contend that paragraph 2(a) of Counts III through XI charging a scheme to defraud the Fund of the services of O'Malley and Massa actually charges two separate offenses, one as to O'Malley and another as to Massa. We disagree.

As the indictment stands it alleges a single scheme to deprive the Fund of the services of two employees. While each scheme, if engaged in separately, might indeed constitute a separate offense, that is not determinative. See *Zeidman*, 540 F.2d at 316–317. Fed.R.Crim.P. 7(c) which permits a single count to include an allegation that an offense was committed by one or more specified means, "necessarily contemplates that two or more acts, each one of which would constitute an offense standing alone, may be joined in a single count." *Pavloski*,

prosecution where there is no other substantive

574 F.2d at 936. All the defendants have demonstrated is that the government might have brought separate charges for attempting to deprive the Fund of the services of each employee if there was more than one "scheme to defraud." The indictment proceeds, instead, on the theory that there was a single scheme designed to defraud the Fund involving the services of both named individuals; it does not include two separate offenses. If, at trial, the government introduces evidence sufficient to establish the "scheme" as to only one of those two individuals, that would create a variance between the indictment and the proof which we can address at the appropriate time. As it stands, Counts III through XI are not fatally duplicitous.

For the foregoing reasons, the defendants' motions to dismiss all or part of the indictment for failure to state an offense, for vagueness, for multiplicity, and for duplicity, are denied.

## V

Defendants contend that the indictment must be dismissed because of what they claim was a twenty-two month delay between the time the investigation was completed and the time they were indicted. This delay, defendants argue, deprived them of their rights under the due process clause of the fifth amendment and the compulsory process clause of the sixth amendment, because during this period Frank Fitzsimmons ("Fitzsimmons") died. Until his death, Fitzsimmons was president of the Teamsters' Union and, it is alleged, his death deprived defendants of his testimony, and therefore of the opportunity to present an effective defense.

■ The due process clause does place limits on the Government's decision to postpone indictment. In a dictum in *United States v. Marion*, 404 U.S. 307, 192 S.Ct. 455, 30 L.Ed.2d 468 (1971), the Court said:

> [T]he statute of limitations does not fully define appellees' rights with respect to

offense alleged.

the events occurring prior to indictment. Thus, the Government concedes that the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused. *Id.* at 324, 92 S.Ct. at 465 (footnote omitted).

While the Court declined to delineate the exact contours of this due process limitation on pre-indictment delay, it did make it clear that actual prejudice, and not merely the passage of time, must be proven, and that the government must be shown to have "intentionally delayed to gain some tactical advantage over appellees or to harass them." *Id.* at 325, 92 S.Ct. at 466. This was made clearer in *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), where the Court stated that "*Marion* makes clear that proof of prejudice is generally a necessary but not a sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." *Id.* at 790, 97 S.Ct. at 2049.

The Court of Appeals for this Circuit has held that the initial burden of going forward on a claim under *Marion* and *Lovasco* is on the accused:

> [O]nce the defendant has proven (1) actual prejudice (2) resulting from the delay, the burden shifts to the Government to show why the delay was necessary. *United States v. King*, 593 F.2d 269, 272 (7th Cir. 1979).

In this case, defendants have failed to meet their initial burden of proving actual prejudice resulting from the death of Fitzsimmons. We have reviewed Fitzsim-

mons' grand jury testimony and a summary of an FBI interview conducted with him, which were submitted to this court in camera, as well as the affidavit of his attorney, Seymour Glanzer. The material indicates that Fitzsimmons had no testimony to give which would have had any material bearing on this case. Fitzsimmons indicated that he was unaware of any attempts to influence Senator Howard Cannon or any other official, and was never told of the substance of a meeting between Senator Cannon and several of the defendants, which the government claims was at the heart of the conspiracy alleged in the indictment. Fitzsimmons' inability to recall the events in question in this case made his testimony particularly unhelpful to either party, since claims of inability to recollect are generally difficult to test through cross-examination, and because the testimony does not indicate that the acts alleged in the indictment did or did not occur, but simply that Fitzsimmons had no present recollection of them.[6]

Defendants have failed to demonstrate any actual prejudice resulting from the twenty-two month pre-indictment delay in this case.[7] The motion to dismiss under the fifth amendment is denied.[8]

## VI

Defendants contend that the indictment must be dismissed because the government failed to present certain exculpatory evidence to the grand jury. Defendants claim that the government was constitutionally obligated, under the grand jury and due process clauses of the fifth amendment, to present three items to the grand jury: certain speeches given by Senator Howard Cannon in 1978, the fact that the Department of Justice had decided not to seek an

---

**6.** Fitzsimmons was in poor health at the time of his grand jury appearance and FBI interview, a factor which may have contributed to his inability to recollect the events in question.

**7.** The government contends that the investigation in this case continued until May, 1981, shortly before the indictment. Thus, the government contends there was no actual pre-indictment delay in this case. We need not

resolve this question, since we conclude that defendants have not proven actual prejudice even if a twenty-two month delay is assumed.

**8.** For the same reasons, the motion to dismiss under the compulsory process clause of the sixth amendment is denied. *See Washington v. Texas*, 388 U.S. 14, 23 n.21, 87 S.Ct. 1920, 1925 n.21, 18 L.Ed.2d 1019 (1967).

indictment of Senator Cannon, and the fact that defendant Roy Williams had passed two polygraph examinations containing questions relevant to the charges being considered by the grand jury.

 The government has indicated that the speeches and the decision not to seek indictment of Senator Cannon were presented to the grand jury. We have examined in camera the relevant portions of the grand jury testimony, colloquy, and exhibits, and have concluded that the grand jury was adequately apprised of these facts.

The government concedes that the results of the polygraph examination of Williams were not presented to the grand jury. This material was generated over the course of two examinations. On August 8, 1980, Williams submitted to a polygraph or "lie-detector" examination conducted by Mr. Raymond J. Weir, Jr.[9] The government has never disputed Weir's qualifications to conduct a polygraph examination. During this examination, Williams stated that he had not attempted to "bribe" or "improperly influence" Senator Cannon. Weir interpreted the data generated to indicate that Williams was telling the truth. Counsel for Mr. Williams then provided attorneys for the government with copies of Weir's report. Douglas P. Roller, Attorney in

Charge of the Chicago Strike Force of the Department of Justice, indicated to counsel for Williams that the inclusion of the word "improperly" in the questions asked of Williams invalidated the test.

On October 19, 1980, Weir conducted a second polygraph examination of Williams, deleting the word "improperly" from the questions asked. After examining the data, Weir again concluded that Williams was truthful when he denied offering anything to Senator Cannon in return for the Senator's assistance on the issue of trucking deregulation.[10] Counsel for Williams provided the government with a copy of the report on this examination. The government concedes that neither the first nor second report was presented to the grand jury.

In order to rule on this motion, we must first determine the scope of the government's duty to present exculpatory evidence to the grand jury. Then, we will address the question of whether that duty was breached in this case.

**A**

 The scope of the prosecutor's duty to disclose exculpatory evidence to the grand jury is unclear in this Circuit. The Court of Appeals indicated, in *United*

9. A polygraph or lie-detector is a device which measures various physiological activity of the subject. The proponents of the polygraph assert that an experienced examiner can analyze the data generated by the device in a way which can determine if the subject believes he is telling the truth. *See United States v. Ridling*, 350 F.Supp. 90, 92 (E.D.Mich.1972):

The polygraph is based on the principle that the autonomic nervous system will respond to stressful conditions and that sympathetic parts of that system will respond involuntarily. These parts of the system are not controllable. Their reaction is automatic. It is well established that the sympathetic part of the autonomic nervous system causes internal organs of the body, the heart, the breathing apparatus, the perspiration glands, the stomach and others to change their activity when placed under stress, as for example, when confronted by an emergency. The polygraph measures some of the results of this automatic response to stress. Current versions of the device measure changes in the activity of some of these internal organs,

for example, the changes in the blood pressure, pulse, respiration, and the sweat gland activity.

A lie is an emergency to the psychological well being of a person and causes stress. Attempts to deceive cause the sympathetic branch of the autonomic nervous system to react and cause changes of such a magnitude that they can be measured and interpreted. There is wide agreement that a properly-administered examination is reliable at least 70 percent of the time. *See McMorris v. Israel*, 643 F.2d 458, 461–62 (7th Cir. 1981), *petition for cert. docketed*, No. 81–189, 50 U.S.L.W. 3023 (U.S. July 30, 1981).

10. The indictment charges Williams with attempting to obtain Senator Cannon's assistance on the deregulation issue by offering to help the Senator obtain, at a bargain price, certain property owned by the pension fund of the Teamsters' Union. Williams was an official of the union during this period.

*States v. Gardner*, 516 F.2d 334 (7th Cir.), *cert. denied*, 423 U.S. 861, 96 S.Ct. 118, 46 L.Ed.2d 89 (1975), that this duty, if it exists at all, is very narrow. The court stated that the grand jury's "inquiry [ ] determines only whether there is probable cause to believe that a crime has been committed. Thus, the government on its own need not produce evidence that undermines the credibility of its witnesses and the defendant has no absolute right to appear before the grand jury." *Id.* at 335–36 (citations omitted). However, *Gardner* speaks only of evidence which goes to "credibility," and not necessarily evidence which directly exculpates the target of a grand jury investigation. Moreover, the actual holding of *Gardner* is narrow: that a defendant has no constitutional right to testify before the grand jury where the grand jury itself has made no request for his testimony. *See id.* at 336.[11]

The court seemed to indicate in *In re Special April 1977 Grand Jury*, 587 F.2d 889 (7th Cir. 1978) that an indictment might have to be dismissed if "substantial evidence directly exculpating" the defendant were not presented to the grand jury. *See id.* at 893. However, this statement was dictum. Thus, the scope of the duty to present exculpatory evidence to the grand jury is uncertain at best in this Circuit. We write on a relatively clean slate.

█ The considerations favoring a constitutional duty to disclose exculpatory evidence are several. The first goes to the grand jury's unique role in the constitutional system. The purpose of the grand jury is "to provide a fair method for instituting criminal proceedings." *Costello v. United States*, 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956). The grand jury serves an important constitutional function as a check on prosecutorial power; it is "a protector of citizens against arbitrary and oppressive governmental action." *United States v. Calandra*, 414 U.S. 338, 343, 94

S.Ct. 613, 617, 38 L.Ed.2d 561 (1974); *see United States v. Mandujano*, 425 U.S. 564, 571, 96 S.Ct. 1768, 1774, 48 L.Ed.2d 212 (1976) (plurality opinion); *id.* at 589–90, 96 S.Ct. at 1782–83 (Brennan, J., concurring in the judgment). Its "mission is to clear the innocent, no less than to bring to trial those who may be guilty." *United States v. Dionisio*, 410 U.S. 1, 16–17, 93 S.Ct. 764, 772–73, 35 L.Ed.2d 67 (1973) (footnote omitted); *see Wood v. Georgia*, 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962). In order to perform its role, the grand jury must remain both independent and informed. *See United States v. Dionisio*, 410 U.S. 1, 16, 93 S.Ct. 764, 772, 35 L.Ed.2d 67 (1973); *Wood v. Georgia*, 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962); *Stirone v. United States*, 361 U.S. 212, 218, 80 S.Ct. 270, 273–74, 4 L.Ed.2d 252 (1960). The grand jury must be able to obtain all relevant evidence, since only then can its judgment truly be informed. *See United States v. Mandujano*, 425 U.S. 564, 573, 96 S.Ct. 1768, 1775, 48 L.Ed.2d 212 (1976) (plurality opinion); *United States v. Calandra*, 414 U.S. 338, 343–44, 94 S.Ct. 613, 617–18, 38 L.Ed.2d 561 (1974); *Branzburg v. Hayes*, 408 U.S. 665, 688, 701–02, 92 S.Ct. 2646, 2666–67, 33 L.Ed.2d 626 (1972). If the prosecutor were to conceal probative exculpatory evidence, he would effectively subvert the constitutional function of the grand jury. Its independence and ability to check prosecutorial power would be grossly undermined. Judge Leighton has written,

> When a prosecutor refuses to present exculpatory evidence, he, in effect, destroys the existence of an independent and informed grand jury .... [T]he constitutional guarantee that no person shall be held to answer for a capital or otherwise infamous crime, unless on presentment or indictment of a grand jury, presupposes an investigative body acting independently of either the prosecuting attorney or judge. *United States v. Gold*, 470 F.Supp. 1336, 1352–53 (N.D.Ill.1979).

---

**11.** *See also In re November 1979 Grand Jury*, 616 F.2d 1021, 1023 (7th Cir. 1980) (Referring to *United States v. Gold*, 470 F.Supp. 1336 (N.D.Ill.1979), in which the court dismissed an indictment for failure to present exculpatory evidence to the grand jury, as an "unusual decision.").

*Accord, United States v. Phillips Petroleum Co.*, 435 F.Supp. 610, 618–20 (N.D.Okla. 1977); *United States v. DeMarco*, 401 F.Supp. 505, 513–14 (C.D.Cal.1975), *aff'd on other grounds*, 550 F.2d 1224 (9th Cir.), *cert. denied*, 434 U.S. 827, 98 S.Ct. 105, 54 L.Ed.2d 86 (1977).

The second consideration supporting a duty to present exculpatory evidence to the grand jury springs from the prosecutor's constitutional role. A prosecutor is not simply another advocate. He is the attorney of the people, and as such, has an independent duty to seek justice even when it may hurt his case. *See* ABA Code of Professional Responsibility EC 7–13 (1980). The prosecutor has a duty to refrain from unfair or deceptive tactics. *See Napue v. Illinois*, 360 U.S. 264, 269–70, 79 S.Ct. 1173, 1176–77, 3 L.Ed.2d 1217 (1959); *Mooney v. Holohan*, 294 U.S. 103, 112–13, 55 S.Ct. 340, 341–42, 79 L.Ed. 791 (1935). This obligation does not extend only to the prosecutor's conduct at trial; his duty of fairness applies during the pretrial stage as well. *See United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). "For though the attorney for the sovereign must prosecute the accused with earnestness and vigor, he must always be faithful to his client's overriding interest that 'justice shall be done.'" *United States v. Agurs*, 427 U.S. 97, 110–11, 96 S.Ct. 2392, 2400–01, 49 L.Ed.2d 342 (1976); *see Brady v. Maryland*, 373 U.S. 83, 87–88, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963); *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). Failing to present evidence which exculpates the target to the grand jury clearly violates this constitutional duty of the prosecutor to remain fair, and ensure that "justice shall be done."

However, there are also powerful considerations militating against a duty to disclose exculpatory evidence to the grand jury. Chief among them is the strong policy against encumbering the flexible grand jury process with procedural requirements which would turn what was intended to be an ex parte process which determines probable cause into a full-blown trial on the merits. *See United States v. Calandra*, 414 U.S. 338, 349, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974); *United States v. Dionisio*, 410 U.S. 1, 17–18, 93 S.Ct. 764, 773, 35 L.Ed.2d 67 (1973). If prosecutors were required to present what was in essence the target's defense, then the grand jury process would be distorted into a second trial on the merits.

> If indictments were to be held open to challenge on the ground that there was inadequate or incomplete evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on its merits. *Costello v. United States*, 350 U.S. 359, 360 [76 S.Ct. 406, 407, 100 L.Ed. 397] (1956).[12]

Another consideration is the difficulty in determining what evidence is exculpatory:

> It would be an undue interference with the grand jury for a court to attempt to surmise what significance the grand jury would have attached to the testimony of various witnesses who were not called before it .... [In imposing the duty to present exculpatory evidence,] a court runs the risk of interfering too much with the grand jury process and does so largely on the basis of guessing what evidence a grand jury might have found per-

12. The actual holding of *Costello*, that an indictment need not be dismissed if hearsay evidence was presented to the grand jury, is considerably narrower than the dictum quoted above. *Costello* certainly cautions courts against burdening the grand jury process by allowing litigation of issues other than the facial validity of the indictment, but it does not stand for the proposition that no issue save facial validity can ever be litigated.

suasive. *United States v. Mandel*, 415 F.Supp. 1033, 1041–42 (D.Md.1976), *aff'd by an equally divided court*, 602 F.2d 653 (4th Cir. 1979) (en banc) (per curiam), *cert. denied*, 445 U.S. 961 [100 S.Ct. 1647, 64 L.Ed.2d 236] (1980).

*Accord, United States v. Weingartner*, 485 F.Supp. 1167, 1175 (D.N.J.1979).

 Reconciling these competing considerations is by no means easy. A broad duty to disclose exculpatory evidence would destroy the unique role of the grand jury as a flexible and non-adversarial process, and enmesh prosecutors and judges in well-nigh impossible judgments as to what might be considered exculpatory. However, imposing no duty whatsoever to present exculpatory evidence is an equally unattractive alternative. Giving prosecutors untrammelled freedom to pick and choose which evidence they will present to a grand jury would make a mockery of their constitutional duty of fairness, and render the grand jury meaningless as a check on prosecutorial abuse. Prosecutors should not be permitted to mislead the grand jury through selective presentation of evidence. *See United States v. Samango*, 607 F.2d 877 (9th Cir. 1979); *United States v. Ciambrone*, 601 F.2d 616, 623 (2d Cir. 1979); *United States v. Estepa*, 471 F.2d 1132 (2d Cir. 1972); *United States v. Provenzano*, 440 F.Supp. 561, 565 (S.D.N.Y.1977); *United States v. Pastor*, 419 F.Supp. 1318, 1324 (S.D.N.Y.1975). Some accommodation between these competing considerations is necessary.

 While prosecutors and courts should not have to make nice judgments about what constitutes exculpatory evidence which must be presented to the grand jury, flagrant abuse of the power to determine what evidence the grand jury will hear cannot be tolerated. *See United States v. Trass*, 644 F.2d 791 (9th Cir. 1981); *United States v. Samango*, 607 F.2d 877 (9th Cir. 1979); *United States v. Lasky*, 600

F.2d 765, 768 (9th Cir. 1979); *United States v. Thompson*, 576 F.2d 784, 786 (9th Cir. 1978); *United States v. Kennedy*, 564 F.2d 1329, 1335–38 (9th Cir. 1977), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978); *United States v. Basurto*, 497 F.2d 781, 784–87 (9th Cir. 1974); *United States v. Nelson*, 486 F.Supp. 464, 474–75 (W.D. Mich.1980); *United States v. Gallo*, 394 F.Supp. 310, 315 (D.Conn.1975). Accordingly, while prosecutors need not present to the grand jury all circumstances which might be considered exculpatory, they must present evidence which clearly negates the target's guilt. *See United States v. Ciambrone*, 601 F.2d 616, 622–25 (2d Cir. 1979); *United States v. Furman*, 507 F.Supp. 848, 850–51 (D.Md.1981); *United States v. Linton*, 502 F.Supp. 861, 868 (D.Nev.1980); *United States v. Deerfield Specialty Papers, Inc.*, 501 F.Supp. 796, 804–07 (E.D.Pa.1980); *United States v. Olin Corp.*, 465 F.Supp. 1120, 1127–28 (W.D.N.Y.1979); *United States v. Depalma*, 461 F.Supp. 778, 796–97 (S.D.N.Y.1978); *United States v. Braniff Airways, Inc.*, 428 F.Supp. 579, 586 (W.D. Tex.1977); *United States v. Mandel*, 415 F.Supp. 1033, 1040–42 (D.Md.1976), *aff'd by an equally divided court*, 602 F.2d 653, 654 (4th Cir. 1979) (per curiam) (en banc), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980), 1 ABA Project on Standards for Criminal Justice, ABA Standards for Criminal Justice, Standard 3–3.6(b) (2d ed. 1980).[13] We recognize that it will not always be easy to apply this test; however, it should eliminate most of the problems involved with having to determine what might be considered exculpatory in the abstract, while still not permitting prosecutors to undermine completely the grand jury's function as a check on prosecutorial power.

### B

 It remains to be determined whether the polygraph results in question qualify as evidence which clearly negates Williams'

---

**13.** *See generally United States v. Narciso*, 446 F.Supp. 252, 296–97 (E.D.Mich.1977). The test we enunciate finds support in *In re Special April 1977 Grand Jury*, 587 F.2d 889, 893 (7th Cir. 1978), which stated that "substantial evidence directly exculpating" a target might have to be presented to a grand jury.

guilt and therefore evidence which was improperly withheld from the grand jury. This inquiry hinges on the question of whether the results were sufficiently probative to meet the standard of clearly negating guilt. We hold that they were not.

 There is a long history of judicial suspicion of polygraph results, going back to *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), the seminal case upholding the exclusion of polygraph evidence. *Frye* held that polygraphy was not sufficiently reliable to generate admissible evidence, since it did not rest on a principle which had "gained general acceptance in the particular field in which it belongs." *Id.* at 1014.[14] This Circuit has abandoned *Frye*; district courts have discretion to admit or exclude polygraphic evidence. *See United States v. Lupo*, 652 F.2d 723, 728 (7th Cir. 1981); *United States v. Rumell*, 642 F.2d 213, 215 (7th Cir. 1981); *United States v. Bursten*, 560 F.2d 779, 785 (7th Cir. 1977) (per curiam); *United States v. Sweet*, 548 F.2d 198, 203 (7th Cir.), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1653, 52 L.Ed.2d 361 (1977); *United States v. Infelice*, 506 F.2d 1358, 1365 (7th Cir. 1974); *United States v. Chastain*, 435 F.2d 686, 687 (7th Cir. 1970) (per curiam). *But see United States v. Tranowski*, 659 F.2d 750, 755–56 (7th Cir. 1981). However, while abandoning *Frye*, this Circuit has remained cognizant of the dangers of such evidence. The court has repeatedly stated that polygraph evidence tends to be unreliable, and that district courts will rarely err when they exclude it. *See United States v. Rumell*, 642 F.2d 213, 215 (7th Cir. 1981); *United States v. Bursten*, 560 F.2d 779, 785–86 (7th Cir. 1977) (per curiam); *United States v. Penick*, 496 F.2d 1105, 1109–10 (7th Cir. 1974).[15] Accordingly, it seems clear that polygraph evidence is not sufficiently probative to clearly negate guilt. If the Constitution is not violated when a district court refuses to let a petit jury determining guilt beyond reasonable doubt hear testimony concerning lie detection, it can hardly be violated if a prosecutor declines to allow a grand jury determining probable cause to believe the defendant has committed a crime to hear such evidence.

 However, we do not rely solely on the inherent unreliability of polygraph evidence. It may be that such evidence, under certain circumstances, is significantly probative.[16] However, before such evidence can be considered probative, some foundation must be established indicating that the particular evidence tendered can be considered reliable. *See generally* 3 J. Weinstein & M. Berger, Weinstein's Evidence § 702[03] (1981); 2 J. Wigmore, Evidence

---

**14.** Strangely, *Frye* seems to have little application outside of the area of lie detection:

> The *Frye* case is often cited by courts dealing with scientific evidence and is usually followed when the admissibility of lie detector evidence is in issue. In other areas, it has had remarkably little influence for a case that has received so much attention .... Although one can find cases which apply the *Frye* rule in areas other than lie detection, courts today generally recognize that any relevant scientific evidence supported by qualified expert witnesses should be received unless there are specific reasons for excluding it, such as the danger of prejudicing or misleading the jury. The criterion of general scientific acceptability is appropriate as a condition for the judicial notice of scientific facts but not as a condition for admissibility of controvertible testimony. R. Lempert & S. Saltzberg, A Modern Approach to Evidence 934–35 (1977).

Frye is not without its critics. *See id.*; C. McCormick, Evidence § 203 (Cleary ed. 1973);

22 C. Wright & K. Graham, Federal Practice and Procedure § 5168 (1978); Gianelli, *The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half-Century Later*, 80 Colum. L.Rev. 1197 (1980); Strong, *Questions Affecting the Admissibility of Scientific Evidence*, 1970 U.Ill.L.F. 1, 9–14.

It is unclear whether the Federal Rules of Evidence follow the *Frye* rule, *see* Advisory Committee's Note, Fed.R.Evid. 703, although some leading commentators feel the rules have repudiated *Frye*. See C. Wright & K. Graham, *supra*; Weinstein, Book Review, 81 Colum.L. Rev. 441, 443 n. 13 (1981).

**15.** *Accord, United States v. McIntyre*, 582 F.2d 1221, 1226 (9th Cir. 1978); *United States v. Marshall*, 526 F.2d 1349, 1360 (9th Cir. 1975).

**16.** *See McMorris v. Israel*, 643 F.2d 458 (7th Cir. 1981), *petition for cert. docketed*, No. 80–189, 50 U.S.L.W. 3023 (U.S. July 30, 1981).

§§ 556–63 (J. Chadbourne rev. 1979). In particular, the proponent of polygraph evidence must lay a foundation establishing that the particular evidence offered contains sufficient indicia of reliability to warrant admission. *See United States v. Russo*, 527 F.2d 1051, 1058–59 (10th Cir. 1975); *United States v. Marshall*, 526 F.2d 1349, 1360 (9th Cir. 1975); *United States v. Oliver*, 525 F.2d 731, 736–37 (8th Cir. 1975), *cert. denied*, 424 U.S. 973, 96 S.Ct. 1477, 47 L.Ed.2d 743 (1976); *United States v. Chastain*, 435 F.2d 686, 687 (7th Cir. 1970) (per curiam) (citing 2 A. Amsterdam, B. Segal & M. Miller, Trial Manual for the Defense of Criminal Cases §§ 397–402 (1967)).[17] Of course, Williams was not seeking to introduce the polygraph results into evidence, and the usual rules of evidence do not apply before the grand jury. *See United States v. Calandra*, 414 U.S. 338, 345–46, 94 S.Ct. 613, 618–19, 38 L.Ed.2d 561 (1974); *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956); *Holt v. United States*, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910). However, the principle underlying the duty to lay a foundation does apply to Williams' tender of the results to the prosecutors. The government was not obligated to treat the evidence as probative merely because Williams' counsel claimed it was. Williams was obligated to make a showing that the evidence had sufficient indicia of reliability before the prosecutors were obligated to treat it as clearly negating guilt.

In this case, Williams tendered no material indicating that the polygraph results were reliable other than including a copy of Weir's resume with the results. That is simply not sufficient to establish the reliability of the results. There is wide agreement that the validity of polygraph results depends on a large variety of factors, including physiological abnormalities of the examinee, extreme nervousness or tension, anger or resentment of examinee, inadequate phrasing of questions, mental abnormalities of the examinee, appropriateness of control questions, expertise of the examiner, methodology employed in reading the graphs, number of indices employed to generate data, and use of auxiliary sources of data. *See United States v. Alexander*, 526 F.2d 161, 165–66 (10th Cir. 1975); *United States v. Wilson*, 361 F.Supp. 510 (D.Md. 1973); *United States v. Urquidez*, 356 F.Supp. 1363 (C.D.Cal.1973); *United States v. DeBetham*, 348 F.Supp. 1377, 1385–88 (S.D.Cal.), *aff'd*, 470 F.2d 1367 (9th Cir. 1972), *cert. denied*, 412 U.S. 907, 93 S.Ct. 2299, 36 L.Ed.2d 972 (1973); A. Moenssens, R. Moses & F. Inbau, Scientific Evidence in Criminal Cases §§ 14.04–.08 (1973); President's Commission on the Assassination of President Kennedy, Report of the President's Commission on the Assassination of President Kennedy 813–16 (1964); J. Reid & F. Inbau, Truth and Deception 61–66, 182–291 (1977); Abell, *Polygraph Evidence: The Case Against Admissibility in Federal Criminal Trials*, 15 Am.Crim.L.Rev. 29 (1977); Dearman & Smith, *Unconscious Motivation and the Polygraph Test*, Am.J. Psychiatry, May 1963, at 1017; Forkosch, *The Lie Detector and Mechanical Jurisprudence*, 28 Okla.L.Rev. 288, 301–05 (1975); Highleyman, *The Deceptive Certainty of the "Lie Detector,"* 10 Hastings L.J. 47, 57–62 (1958); Koffler, *The Lie Detector—A Critical Appraisal of the Technique as a Potential Undermining Factor in the Judicial Process*, 3 N.Y.L.F. 123, 143–46 (1957); Skolnick, *Scientific Theory and Scientific Evidence: An Analysis of Lie Detection*, 70 Yale L.J. 694 (1961); Slowick & Buckley, *Relative Accuracy of Polygraph Examiner Diagnosis of Respiration, Blood Pressure, and GSR Recordings*, 2 J. Police Sci. &

---

**17.** *See generally State v. Valdez*, 91 Ariz. 274, 279, 283, 371 P.2d 894, 900–01 (1962); *Commonwealth v. A Juvenile*, 365 Mass. 421, 433, 313 N.E.2d 120, 128 (1974); *State v. McDavitt*, 62 N.J. 36, 46, 297 A.2d 849, 854–55 (1972); *State v. Dorsey*, 88 N.M. 184, 185, 539 P.2d 204, 205 (1975); *State v. Stanislawski*, 62 Wis.2d 730, 742–43, 216 N.W.2d 8, 13–15 (1974); Gianelli, *supra* note 9, at 1203, 1245–50; Strong, *supra* note 9, at 9–15; Tarlow, *Admissibility of Polygraph Evidence in 1975: An Aid in Determining Credibility in a Perjury-Plagued System*, 26 Hastings L.Rev. 917, 947–48 (1975); Note, *The Emergence of the Polygraph at Trial*, 73 Colum.L.Rev. 1120, 1141–42 (1973); Note, *Pinocchio's New Nose*, 48 N.Y.U.L.Rev. 339, 348–49 (1973).

Admin. 305 (1975); Trovillo, *Scientific Proof of Credibility*, 22 Tenn.L.Rev. 743 (1953); Wicklander & Hunter, *The Influence of Auxiliary Sources of Information in Polygraph Diagnosis*, 3 J. Police Sci. & Admin. 405 (1975); Note, *The Polygraphic Technique: A Selective Analysis*, 20 Drake L.Rev. 330, 332–26 (1975). *See generally* House Rep.No.198, 89th Cong., 1st Sess. (1965). Moreover, there is reason to believe that tests such as the one conducted here, which are performed at the request of the examinee without advance notice to the Government, are particularly unreliable since the examinee knows that if he "fails" the test his counsel will not submit the results to the Government, and therefore is under less stress. *See McMorris v. Israel*, 643 F.2d 458, 463 (7th Cir. 1981), *petition for cert. docketed*, No. 81–189, 50 U.S.L.W. 3023 (July 30, 1981); *United States v. Wilson*, 361 F.Supp. 510, 514 (D.Md.1973); *People v. Adams*, 53 Cal.App.3d 109, 125 Cal. Rptr. 518 (1975); *Lhost v. State*, 85 Wis.2d 620, 271 N.W.2d 121 (1978); Abell, *Polygraph Evidence: The Case Against Admissibility in Federal Criminal Trials*, 15 Am. Crim.L.Rev. 29, 35 (1977); Orne, *Implications of Laboratory Research for the Detection of Deception*, 2 Polygraph 169, 193–95 (1973). Williams provided the Government with no information as to how these various factors were controlled. Therefore, the government was under no duty to treat the evidence as sufficiently reliable and therefore exculpatory.[18] *See United States v. Glover*, 596 F.2d 857, 867 (9th Cir. 1979), *cert. denied*, 444 U.S. 857, 860, 100 S.Ct. 117, 124, 62 L.Ed.2d 76, 81 (1980).

Accordingly, the motion to dismiss for failure to present exculpatory evidence to the grand jury is denied. We express no view on the question whether, if the proper foundation is laid, the polygraph results would be admissible at trial.

## VII

Defendants have moved to dismiss the indictment because of violation of the Federal Wiretap Statute, breach of grand jury secrecy, and government-generated pre-indictment publicity.

**18.** *Cf. United States v. Wainwright*, 413 F.2d 796, 803 (10th Cir. 1969), cert. denied, 396 U.S. 1009, 90 S.Ct. 566, 24 L.Ed.2d 501 (1970):

Despite the periodical literature cited relating to the reliability of polygraph testing, Wainwright laid no predicate for the admissibility of this evidence. Without doubt, matters of factual proof must keep pace with developing scientific standards. And rules of evidence exist to assist the jury in arriving at factual conclusions. But no judgment can be made without relevant expert testimony relating to the probative value of such evidence.

In *McMorris v. Israel*, 643 F.2d 458 (7th Cir. 1981), *petition for cert. docketed*, No. 81–189, 50 U.S.L.W. 3023 (U.S. July 30, 1981), the court held the refusal of a prosecutor to stipulate to the admissibility of polygraph evidence was a denial of due process of law. However, *McMorris* was decided in the context of a Wisconsin rule of evidence law which deemed polygraph evidence sufficiently reliable to be admitted upon stipulation. This meant that "Wisconsin [was] unable to assert many of the traditional objections to polygraph evidence," *id.* at 463. We do not operate under the Wisconsin rule in this case. Moreover, the holding of *McMorris* was not bottomed on a judgment as to the reliability of polygraph evidence. Rather, the court held that the prosecutor could not refuse to stipulate in a totally unprincipled manner.

In essence, therefore, we find the prosecutor's veto of the test in the instant case to be constitutionally impermissible because he stated no reasons which might be reviewed by the trial court. From all that appears, he was acting solely for tactical reasons in the belief that a test would not be helpful to his case. . . . Certainly, no proper state purpose is served by allowing a purely tactical veto power. *We do not hold that Wisconsin may not absolutely refuse to admit polygraph evidence, or that a judge may not refuse to admit polygraph evidence in a particular case*; we merely hold that it offends due process for the prosecutor, as an adversary, to exercise an unrestricted veto—unrelated on the record to any reasons appropriate to the stipulation requirement—over the significantly exculpatory evidence in the instant case. 643 F.2d at 466 (emphasis supplied). *See United States v. Lupo*, 652 F.2d 723, 727–28 (7th Cir. 1981). In light of the failure of Williams to establish the reliability of the results in this case, we do not find the government's refusal to submit it to the grand jury to be "purely tactical." Moreover, we find it not without significance that, subsequent to *McMorris*, Wisconsin has rejected its prior rule and no longer considers polygraph evidence sufficiently reliable to be admitted upon stipulation. *See State v. Dean*, 103 Wis.2d 228, 307 N.W.2d 628 (1981).

■ With respect to the wiretap statute, defendants allege that the government disclosed material obtained from wiretaps and other electronic surveillance to the press, in violation of 18 U.S.C. § 2517 (1976). Assuming this is the case, dismissal of the indictment is not warranted. Congress authorized only a civil remedy for a violation of § 2517, rejecting more severe sanctions. *Compare* 18 U.S.C. § 2518(10) (Supp. II 1978) (requiring suppression of evidence obtained pursuant to unlawfully intercepted wire or oral communications), *with* 18 U.S.C. § 2520 (1976) (authorizing a civil remedy for unlawful disclosure of oral or wire communications). *See United States v. Horton*, 601 F.2d 319, 324 (7th Cir. 1979); *Fleming v. United States*, 547 F.2d 872 (5th Cir. 1977), *cert. denied*, 434 U.S. 831, 98 S.Ct. 113, 54 L.Ed.2d 90 (1978); *United States v. Vento*, 533 F.2d 838, 855–56 (3d Cir. 1976); *United States v. Ianelli*, 477 F.2d 999, 1001 (3d Cir. 1973), *aff'd on other grounds*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975). *See also Schildcrout v. McKeever*, 580 F.2d 994, 998–99 (9th Cir. 1978).[19]

■ Defendants also argue that the alleged disclosures of material before the grand jury constituted a violation of Fed.R.Crim.P. 6(e). Assuming that the rule was violated, however, dismissal of the indictment is not the appropriate relief. The rule itself does not authorize dismissal; to the contrary, it states, "A knowing violation of Rule 6 may be punished as a contempt of court." *Id.* 6(e)(2). Moreover, the draftsmen of the rule stated that they did not intend it to be used as a basis for challenging indictments. *See* Advisory Committee's Note, 1979 Amendment, Fed.R.Crim.P. 6. While there may be some circumstances where violations of the rule are so blatant that dismissal of the indictment is appropriate, in a case such as this, where there are only generalized charges of improper disclosure, and no particularized evidence of specific unlawful disclosures, dismissal of the indictment is not warranted, *see, In re Grand Jury Investigation*, 610 F.2d 202, 219 (5th Cir. 1980); *United States v. Malatesta*, 583 F.2d 748, 753–54 (5th Cir. 1978), *modified on other grounds*, 590 F.2d 1379 (en banc), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979); *United States v. Dunham Concrete Products*, 475 F.2d 1241, 1259 (5th Cir.), *cert. denied*, 414 U.S. 832, 94 S.Ct. 65, 38 L.Ed.2d 66 (1974); *United States v. Hoffa*, 349 F.2d 20, 43 (6th Cir. 1965), *aff'd on other grounds*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *In re Archuleta*, 432 F.Supp. 583, 599 (S.D.N.Y. 1977); *United States v. Schiavo*, 375 F.Supp. 475, 478 (E.D.Pa.), *aff'd mem.*, 506 F.2d 1053 (3d Cir. 1974), and no evidentiary hearing need be conducted, *see In re Special April 1977 Grand Jury*, 587 F.2d 889, 892–93 (7th Cir. 1978).[20]

■ Finally, defendants argue that the allegedly government generated publicity surrounding this case deprived them of

**19.** This is not a case like *United States v. Brodson*, 528 F.2d 214 (7th Cir. 1975), relied on by defendants, in which the improper disclosure in question was to the grand jury which, in reliance on the improperly disclosed evidence, proceeded to indict the defendant. In such a case, the illegality taints the grand jury itself, and dismissal of the indictment is required. Here, the improper disclosures were allegedly made to the press, not the grand jury. Unlike the *Brodson* grand jury, the grand jury in the instant case was not improperly exposed to evidence which should not have been before it under § 2517. Thus, the *Brodson* exception to the general rule that only a civil remedy lies for improper disclosure under the wiretap statute does not apply to this case.

We also note that defendants have produced nothing which indicates that intercepted communications were disclosed to the press or other unauthorized persons. Defendants rely solely on news accounts which, they claim, demonstrate that the government "leaked" material. However, the articles cited do not clearly indicate that the material leaked was actually intercepted. The leaks may consist solely of government officials' statements to reporters about the intercepted material. It is unclear whether § 2517 applies to such disclosures. However, in light of the view we take of this case, we need not resolve this question.

**20.** This might be a different case if the sanction that defendants sought was contempt, rather than dismissal of the indictment. *See generally In re Grand Jury Investigation*, 610 F.2d 202, 219–21 (5th Cir. 1980).

their constitutional right to an unbiased grand jury.[21] Defendants make no attempt to demonstrate prejudice resulting from the publicity regarding this case. Instead, they argue that they need not demonstrate actual prejudice in a case such as this where the publicity is "government-inspired."[22] Defendants' argument must be rejected for two reasons. First, defendants have been unable to produce, or represent that they will produce, any particularized evidence of specific governmental misconduct. They rely exclusively on news reports which they claim were the result of governmental "leaks" of information. Such generalized and speculative charges are insufficient to warrant the conclusion that the publicity was "government-inspired." *See In re Special April 1977 Grand Jury*, 587 F.2d 889, 892–93 (7th Cir. 1978); *United States v. Mitchell*, 372 F.Supp. 1239 (S.D.N.Y.), ap-

*peal dismissed*, 485 F.2d 1290 (2d Cir. 1973); *United States v. Archer*, 355 F.Supp. 981, 987–89 (S.D.N.Y.1972), *rev'd on other grounds*, 486 F.2d 670 (2d Cir. 1973); *United States v. Sweig*, 316 F.Supp. 1148, 1155 (S.D.N.Y.1970), *aff'd*, 441 F.2d 114 (2d Cir.), *cert. denied*, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971).[23] Second, defendants' contention that they need not demonstrate prejudice is not the law in this Circuit: the focus of the Constitution is on how the defendants are harmed, and not on how prosecutors behave. *See United States v. Stanford*, 589 F.2d 285, 298–99 (7th Cir. 1978); *In re Perlin*, 589 F.2d 260 (7th Cir. 1978).[24] In the absence of any evidence indicating that defendants have been prejudiced by the publicity in this case, they may not have the indictment dismissed. *See Beck v. Washington*, 369 U.S. 541, 82 S.Ct.

**21.** Contrary to the prosecution's assertions, the fifth amendment does guarantee the right to a fair and unbiased grand jury. *See United States v. Gold*, 470 F.Supp. 1336, 1343 (N.D.Ill. 1979); *United States v. Samango*, 450 F.Supp. 1097, 1102 (D.Haw.1978), *aff'd on other grounds*, 607 F.2d 877 (9th Cir. 1979); *United States v. Provenzano*, 440 F.Supp. 561, 564 (S.D.N.Y.1977); *United States v. Sweig*, 316 F.Supp. 1148, 1153 (S.D.N.Y.1970), *aff'd* 441 F.2d 114 (2d Cir.), *cert. denied*, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971); *United States v. DiGrazia*, 213 F.Supp. 232, 235 (N.D. Ill.1963). *See generally United States v. Dionisio*, 410 U.S. 1, 16–17, 93 S.Ct. 764, 772–73, 35 L.Ed.2d 67 (1973); *Lawn v. United States*, 355 U.S. 339, 349–50, 78 S.Ct. 311, 317–18, 2 L.Ed.2d 321 (1958); *Costello v. United States*, 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956). *See also Rose v. Mitchell*, 443 U.S. 545, 551, 99 S.Ct. 2993, 2997, 61 L.Ed.2d 739 (1979) (Constitution prohibits racial discrimination in grand jury selection.). Indeed, the right to be indicted by a grand jury would mean little if that grand jury were not unbiased.

**22.** *Accord, Silverthorne v. United States*, 400 F.2d 627, 632–34 (9th Cir. 1968), *cert. denied*, 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971); *Delaney v. United States*, 199 F.2d 107, 114 (1st Cir. 1952); *United States v. Abrahams*, 493 F.Supp. 296, 305–06 (S.D.N.Y.1980); *United States v. Sweig*, 316 F.Supp. 1148, 1153–55 (S.D.N.Y.1970), *aff'd*, 441 F.2d 114 (2d Cir.), *cert. denied* 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971). *Contra, Gorin v. United States*, 313 F.2d 641, 645 (1st Cir. 1963); *United States v. Archer*, 355 F.Supp. 981, 988–89 (S.D.N.Y.1972), *rev'd on other grounds*, 486

F.2d 670 (2d Cir. 1973); *United States v. Hoffa*, 205 F.Supp. 710, 718 (S.D.Fla.), *appeal dismissed*, 309 F.2d 680 (5th Cir.), *cert. denied*, 371 U.S. 892, 83 S.Ct. 188, 9 L.Ed.2d 125 (1962); *United States v. Dioguardi*, 20 F.R.D. 33, 34 (S.D.N.Y.1956).

**23.** In *In re Special April 1977 Grand Jury*, 587 F.2d at 892, the court noted that the defendant's

> evidence consisted of news media publicity revealing evidence pertinent to the grand jury investigation. Some of the media reports attributed the information to "government sources" or to "sources close to the investigation." The district court was justifiably unimpressed inasmuch as news reporters, as all the world knows, invariably attribute the information they receive to "confidential sources" and, in connection with stories of this nature, to "unnamed sources close to the investigation." Furthermore, the judge noted that much of the material appearing in those news reports could have been disseminated during the Government investigation that preceded impanelment of the jury or by the rumor mills that grind into motion before such investigations begin.

**24.** Defendants cite *Sheppard v. Maxwell*, 384 U.S. 333, 352–55, 86 S.Ct. 1507, 1516–18, 16 L.Ed.2d 600 (1967), and *Estes v. Texas*, 381 U.S. 532, 542–44, 85 S.Ct. 1628, 1632–33, 14 L.Ed.2d 543 (1965), for the proposition that actual prejudice need not be shown. Those cases do not stand for this proposition. *See Chandler v. Florida*, 449 U.S. 560, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981).

955, 8 L.Ed.2d 98 (1962); *United States v. Brien*, 617 F.2d 299, 313 (1st Cir.), *cert. denied*, 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980); *United States v. Matanky*, 482 F.2d 1319, 1323–24 (9th Cir.), *cert. denied*, 414 U.S. 1039, 94 S.Ct. 539, 38 L.Ed.2d 329 (1973); *Silverthorne v. United States*, 400 F.2d 627, 633–34 (9th Cir. 1968), *cert. denied*, 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971); *United States v. Osborn*, 350 F.2d 497, 506–07 (6th Cir. 1965), *aff'd on other grounds*, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966); *Estes v. United States*, 335 F.2d 609, 613 (5th Cir. 1964), *cert. denied*, 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559 (1965); *United States v. Holovachka*, 314 F.2d 345, 351 (7th Cir.), *cert. denied*, 374 U.S. 809, 83 S.Ct. 1695, 10 L.Ed.2d 1033 (1963); *United States v. Nunan*, 236 F.2d 576, 593 (2d Cir. 1956), *cert. denied*, 353 U.S. 912, 77 S.Ct. 661, 1 L.Ed.2d 665 (1957); *United States v. Tallant*, 407 F.Supp. 878, 889 (N.D.Ga.1975); *United States v. Archer*, 355 F.Supp. 981, 987–89 (S.D.N.Y.1972), *rev'd on other grounds*, 486 F.2d 670 (2d Cir. 1973); *United States v. Bally Manufacturing Corp.*, 345 F.Supp. 410, 420–21 (E.D.La.1972); *United States v. Anzelmo*, 319 F.Supp. 1106, 1113–14 (E.D. La.1970); *Melville v. Morgenthau*, 307 F.Supp. 738 (S.D.N.Y.1969); *United States v. Baker*, 262 F.Supp. 657, 668–71 (D.D.C. 1966); *United States v. Hoffa*, 205 F.Supp. 710, 717–18 (S.D.Fla.), *appeal dismissed*, 309 F.2d 680 (5th Cir.), *cert. denied*, 371 U.S. 892, 83 S.Ct. 188, 9 L.Ed.2d 125 (1962); *United States v. Dioguardi*, 20 F.R.D. 33, 34–35 (S.D.N.Y.1956).[25] Whatever prejudice there might have been was most likely ameliorated by Chief Judge Parsons' repeated admonitions to the grand jurors to disregard whatever they might have heard or read about the case:

> It must be presumed that the grand jury followed the court's instructions as to its powers, duties and obligations and that each grand juror fully lived up to and observed his solemn oath. Indeed there is a strong presumption of regularity accorded to the deliberations and findings of grand juries. *United States v. Kahaner*, 204 F.Supp. 921, 923, (S.D.N.Y.1962) (footnote omitted), *aff'd* 317 F.2d 459 (2d Cir.), *cert. denied*, 375 U.S. 835, 836, 84 S.Ct. 62, 11 L.Ed.2d 65 (1963).

The preceding is not intended to suggest that this court is unconcerned with the magnitude of the pre-indictment publicity in this case. The specificity of much of the media's reports on this case creates a disturbing inference that Government attorneys engaged in wide scale "leaking". Particularly disturbing is the failure of the government's attorneys to file affidavits denying any improprieties. If the government cannot offer additional reassurance to the court on this score, we are by no means confident that we will reach the same result when and if the question whether pretrial publicity denied defendants their right to a fair trial is raised.[26] However, at the present time dismissal of the charges is unwarranted. Accordingly, the motion to dismiss is denied.

---

**25.** There is almost no precedent supporting defendants' position. *See* 8 J. Moore, Moore's Federal Practice ¶ 6.04[9] (Waxner rev. 1981) ("It appears, however, that no indictment has been dismissed for prejudicial preindictment publicity regardless of whether the publicity occurred through normal channels, or by unauthorized disclosure of grand jury material to the news media by the government.").

**26.** *See generally United States v. Brien*, 617 F.2d 299, 313 (1st Cir.), cert. denied, 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980):

[I]t does not follow that the remedy for possible exposure to inherently prejudicial publicity should be the same for grand juries as for petit juries. The different treatment of grand and petit juries which may have been exposed to inherently prejudicial publicity is premised, of course, on the theory that the taint of a grand jury will be purged by the deliberations of an untainted petit jury.