**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Patrick C. LUPO, Defendant-Appellant.**

**No. 80–2640.**

United States Court of Appeals,
Seventh Circuit.

Argued April 1, 1981.

Decided July 1, 1981.

---

James R. Glover, Shellow & Shellow, Milwaukee, Wis., for defendant-appellant.

Charles H. Bohl, Asst. U. S. Atty., Milwaukee, Wis., for plaintiff-appellee.

* The Honorable Floyd R. Gibson, Senior Circuit Judge, United States Court of Appeals, Eighth Circuit, sitting by designation.

Before CUMMINGS, Circuit Judge, GIBSON, Senior Circuit Judge,* and CUDAHY, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Patrick Lupo was convicted by a jury in the United States District Court for the Eastern District of Wisconsin on two counts of a three-count indictment. The indictment charged Lupo with (1) conspiracy to possess with intent to distribute 225 pounds of marijuana in violation of 21 U.S.C. § 846 (1976); (2) possession with intent to distribute the marijuana in violation of 21 U.S.C. § 841(a)(1) (1976); and (3) travel and interstate commerce to promote an unlawful activity in violation of 18 U.S.C. § 1952 (1976). Lupo was found guilty on the first two counts and acquitted on the third. Following the September 1980 trial, the district court on November 3, 1980, sentenced Lupo to four and one-half years' imprisonment on each count, to be served concurrently.

On appeal, Lupo contends that the district court erred in failing to suppress the marijuana and a piece of paper presumably dropped by him and admitted into evidence. Lupo also challenges the trial court's limitation on testimony concerning the number of species of marijuana, and the court's failure to provide him, prior to closing argument, with copies of the jury instructions to be given. Finally, Lupo argues that he was punished at sentencing for exercising his right to trial. We affirm the district court.

*Facts* [1]

In early 1980, state and federal law enforcement officers, with the assistance of an informant, were negotiating with Orville Silseth for the purchase of a large quantity of marijuana. On January 31, 1980, in Minneapolis, Minnesota, Special Agent of the Drug Enforcement Agency (DEA) Lewis and Sheriff's Deputy Donlevy met with Silseth. During this meeting they exhibited $108,000 to Silseth, who stated that this

1. The facts are adopted substantially from the magistrate's report which was adopted by the district court.

would be enough money to "break the ice" with his people in Milwaukee who had approximately 300 pounds of marijuana available.

On February 9, 1980, a caravan of automobiles left the Silseth residence for Milwaukee. Silseth and the informant were in one vehicle and Agent Lewis and Sheriff's Deputy Fontana in another. These two cars were followed by cars containing other agents, and also by a surveillance airplane operated by DEA agents. Eventually, the Silseth vehicle stopped at the Steeplechase Inn, a motel located on Interstate Highway 94 in Waukesha, Wisconsin. The vehicle containing Agent Lewis and Deputy Fontana also stopped at the same location. The officers in this vehicle were carrying $90,-000.

Silseth, the informant and Deputy Fontana, operating in an undercover capacity, entered the motel. Silseth made a phone call, returned, and advised Fontana that he was not able to contact his source. Shortly thereafter, Silseth placed another phone call, returned, and then advised Fontana that his source had the 300 pounds of marijuana and that he would pick it up and return in half an hour.

When Silseth left the motel, he proceeded to a Holiday Inn parking lot and thereafter to a group of warehouses in Waukesha.[2] All of this was observed by the agents who were conducting surveillance from the airplane.

DEA Agents Crosby and Love had also been proceeding from Minneapolis to Milwaukee. At the same time the aforementioned events were occurring, Crosby and Love had stopped at a restaurant on Interstate Highway 94 for lunch. While waiting for their take-out order, Crosby observed an individual, later identified as the defendant, Lupo, using the telephone. Agent Love overheard Lupo say, "Do you have the money?" "Did you see the money?" (Pause) "It's in my trunk right now." As Lupo left the restaurant and entered a gray car, Crosby wrote down the license number.

Approximately thirty-five minutes later, Crosby received a radio communication that the car Silseth was in had met a gray car at a Holiday Inn parking lot. Upon being given the location of the gray car after it left the parking lot, Crosby proceeded in that direction, observed the car, and recognized it as the same car he had previously seen at the restaurant.

Crosby kept the gray car under surveillance, and followed it to what he described as a "storage area." He then received another radio communication, based on a report from the airplane, that both the gray car and the maroon car (being driven by Silseth) had their trunk lids open and some activity was going on.

Crosby then proceeded to intercept the gray car as it was leaving the area. It was being driven by Lupo, whom Crosby placed under arrest. Lupo was searched for weapons, handcuffed, and placed in another car. After Lupo was in custody, Crosby looked in the car. He found a piece of paper containing numbers and a phone number, which he claims fell from Lupo's hand before he was taken from the car. Crosby looked in the glove compartment, removed the key from the ignition, and opened the trunk. Marijuana debris and marijuana seeds were found in the trunk.

In a similar manner, Silseth was stopped by other agents who placed him under arrest. Thereafter, the trunk of Silseth's car was opened with a key, and marijuana bales wrapped in opaque plastic were observed therein. Neither defendant gave his consent for the searches that were conducted, and no warrants had been obtained.

Both Lupo and Silseth were indicted on March 4, 1980, by a federal grand jury. They subsequently filed a motion to suppress the marijuana found in the automobile trunks and to suppress the piece of paper. On May 6, 1980, an evidentiary hearing was conducted before a magistrate,

---

**2.** Along the way, Silseth picked up a white male. Apparently, the male left the car prior to its departure from the Holiday Inn.

who filed a written recommendation that the motion be denied. On August 18, 1980, the district court adopted the magistrate's recommendation and findings.

Prior to trial, Silseth entered into a plea bargain agreement. Lupo's case went to trial on September 24, 1980. He was convicted of conspiracy and possession of marijuana with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 846 (1976). Lupo was sentenced to serve, concurrently, four and one-half years on each count, while Silseth received one year, pursuant to his plea bargain.

*Suppression rulings*

■ Lupo admits probable cause existed for the arrests, but he contends that a warrant was required in order to search the trunks of the automobiles. We begin by noting that Lupo probably does not have a "legitimate expectation of privacy" in the search of Silseth's automobile. *See Rawlings v. Kentucky*, 448 U.S. 98, 104–06, 100 S.Ct. 2556, 2561–2562, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois*, 439 U.S. 128, 140, 143, 148–49, 99 S.Ct. 421, 429, 430, 433, 58 L.Ed.2d 387 (1978). Silseth had rented the automobile with funds advanced by the DEA agents. At the time of the arrest, both Lupo and Silseth were in their separate cars, attempting to leave the exchange area. Lupo, under these circumstances, "would not normally have a legitimate expectation of privacy" in the trunk of Silseth's automobile. *Id.* at 149, 99 S.Ct. at 433. Because, however, the issue of the validity of the search of Lupo's trunk is so similar to that of the search of Silseth's, we will address the merits of both situations.

Lupo argues that the recent Supreme Court cases of *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), and *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) should control this case. *See also United States v. Wilson*, 636 F.2d 1161, 1164 (8th Cir. 1980); II LA FAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 7.2 at 540–41 (1978 and Supp.1980). We disagree. Neither *Sanders* nor *Chadwick* involved a search of the interior of an automobile incident to an arrest. Both of those cases involved searches of containers placed inside automobiles, where no arrest was made until after the search. *Sanders*, 442 U.S. at 763–65 & ns. 11 & 14, 99 S.Ct. at 2592–94 & ns. 11 & 14; *Chadwick*, 433 U.S. at 12–14 & n.8, 97 S.Ct. at 2484–2485 & n. 8. The present case is controlled by the Supreme Court opinion in *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

Lupo's theory for extending the *Sanders-Chadwick* line of cases to the instant case rests upon his assertion that he has a reasonable expectation of privacy in the contents of the trunk, and, second, that the automobile was rendered immobile at the time of the arrest. With regard to the latter assertion, Lupo contends that a warrant could easily have been obtained; therefore, a warrant should have been obtained prior to searching the trunks. We agree that an individual may perhaps have a greater expectation of privacy concerning articles placed in a locked trunk of an automobile than in articles located in the interior of the passenger compartment. Lupo's second contention, however, that obtaining a warrant is practicable under these circumstances, must be rejected.

In *Chambers v. Maroney*, 399 U.S. at 51–52, 90 S.Ct. at 1981, the Supreme Court refused to find any difference between immobilizing the car until a warrant was obtained and conducting an immediate search without a warrant, if probable cause existed. In *Sanders*, the Court reaffirmed the application of *Chambers* to the present situation:

We view, however, the seizure of a suitcase as quite different from the seizure of an automobile. In *Chambers*, if the Court had required seizure and holding of the vehicle, it would have imposed a constitutional requirement upon police departments of all sizes around the country to have available the people and equipment necessary to transport impounded automobiles to some central location until warrants could be secured. Moreover, once seized automobiles were

taken from the highway the police would be responsible for providing some appropriate location where they could be kept, with due regard to the safety of the vehicles and their contents, until a magistrate ruled on the application for a warrant. Such a constitutional requirement therefore would have imposed severe, even impossible, burdens on many police departments. See Note, Warrantless Searches and Seizures of Automobiles, 87 Harv.L.Rev. 835, 841–842 (1974). No comparable burdens are likely to exist with respect to the seizure of personal luggage.

*Arkansas v. Sanders,* 442 U.S. at 765–66 n.14, 99 S.Ct. at 2594 n.14.

Simply put, the Supreme Court has refused to burden the public and law enforcement officials with a costly warrant requirement in this type of case. With this rationale, we are in agreement. In the present case, probably two officers would have been required to guard the vehicles, while another would have had to secure the warrant. Since the arrests were made on a Saturday, it is uncertain exactly when a magistrate could have been reached to rule on the warrant application. The time and expense that would have been involved in satisfying a warrant requirement were considerable.

To reiterate, *Chambers* and *Carroll v. United States,* 267 U.S. 132, 153–56, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925), due to the impracticability of obtaining a warrant in this type of case, allow an automobile, stopped in a public place, to be searched whenever probable cause exists to believe contraband is present. *See also Texas v. White,* 423 U.S. 67, 68, 96 S.Ct. 304, 305, 46 L.Ed.2d 209 (1975); *United States v. Garza-Hernandez,* 623 F.2d 496, 500 (7th Cir. 1980). In our view, neither *Chadwick* nor *Sanders* requires a different result.

■ Lupo next contends that a warrant should have been required to remove the plastic wrapping covering the bales in the trunk of Silseth's vehicle.[3] One of the spe-

cial agents testified at trial that some of the bales were punctured and a substance that appeared to be marijuana could be seen. The marijuana was therefore in plain view at the time of the search. *See Sanders,* 442 U.S. at 764–65 n.13, 99 S.Ct. at 2593–94 n.13; *United States v. Zurosky,* 614 F.2d 779, 782, 786 (1st Cir. 1979), *cert. denied,* 446 U.S. 967, 100 S.Ct. 2945, 64 L.Ed.2d 826 (1980). *See also United States v. Sanders,* 631 F.2d 1309, 1315 (8th Cir. 1980). The recent Supreme Court case of *Walter v. United States,* 447 U.S. 649, 656, 100 S.Ct. 2395, 2401, 65 L.Ed.2d 410 (opinion of Stevens, J.) (1980), does not apply here, since the contraband itself was observed by the agent. *See also California v. Robbins,* 103 Cal.App.3d 34, 162 Cal.Rptr. 780 (1980), *cert. granted,* —— U.S. ——, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981).

Finally, Lupo objects to the introduction into evidence of a piece of white paper which contained three-digit numbers corresponding to numbers written on the marijuana bales. The paper also contained phone numbers corresponding to two pay phones at the Steeplechase Inn. At the evidentiary hearing, Lupo admitted that the paper was his, but contended that he had given it to Silseth five minutes before the arrest. DEA Agent Crosby testified in direct conflict to this contention, stating that Lupo had dropped the paper from his hand at the time of the arrest. Lupo then offered to take a polygraph examination to support his version of the events. By doing so, he hoped to give credence to his testimony and thereby invalidate the Government's claim of a plain-view exception to the warrant requirement. The magistrate refused to postpone the hearing and refused Lupo's request that he examine the results of an exam to be taken that same day. Lupo subsequently filed an offer of proof.

■ Lupo contends the magistrate erred in not allowing the polygraph examination. In *McMorris v. Israel,* 643 F.2d 458, 466 (7th Cir. 1981), a Wisconsin state habeas appeal, this court held that "it offends due process for the prosecutor, as an adversary, to exer-

---

**3.** *See ante* at 726.

cise an unrestricted veto—unrelated on the record to any reasons appropriate to the stipulation requirement—over the significantly exculpatory polygraph evidence" in a given case. *McMorris,* however, did not impinge upon the district court's discretion to admit polygraph evidence. *Id.* at 462 n.9; *see United States v. Bursten,* 560 F.2d 779, 785 (7th Cir. 1977).

The district court found the issue to be one of "marginal relevance." We agree. If Lupo did not in fact have the piece of paper in his possession because he had given it to Silseth, then Lupo had no "expectation of privacy" in its seizure. *See Rawlings v. Kentucky,* 448 U.S. at 106, 100 S.Ct. at 2561, 2562, *ante* at 726. Furthermore, the piece of paper was of minor relevance, given the marijuana debris and bales found in the automobiles driven by Silseth and Lupo. We cannot say that the magistrate erred in exercising his discretion. We agree with the finding of the district court that the polygraph examination "would have only served to produce cumulative evidence of questionable reliability on a peripheral issue of doubtful relevance."

*Marijuana species*

■ Lupo argues that only the single species of marijuana, Cannabis sativa L, identified in 21 U.S.C. §§ 802(15), 812(c) (1976), is included in the Federal Controlled Substances Act of 1970. Lupo therefore contends that the district court erred in not permitting him to present evidence that there may exist a number of species, thereby raising doubt as to whether the seized marijuana was Cannabis sativa L.

The United States Court of Appeals for the District of Columbia has addressed in detail the issue of the extent of 21 U.S.C. § 802(15) (1976), and found the statute to outlaw all species of marijuana containing tetrahydrocannabinol, the active ingredient. *United States v. Walton,* 514 F.2d 201 (D.C. Cir. 1975). We are in total agreement with Judge Bazelon's opinion in that case. In so stating, we join all the other circuit courts

4. We therefore disagree with the result reached in *United States v. Lewallen,* 385 F.Supp. 1140 (W.D.Wis.1974).

that have passed on this issue.[4] *See id.* at 204 n.12.

*Jury instructions*

Lupo contends that he was entitled "to know the language the court intended to use" in its jury instructions, prior to the time Lupo made his closing argument. Appellant's brief at 33. Federal Rule of Criminal Procedure 30 provides in part:

> At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. At the same time copies of such requests shall be furnished to adverse parties. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. * *

The trial transcript reveals that the trial judge spent considerable time discussing with the Government and Lupo the proposed instructions of both. Over twenty pages of transcript detail which instructions were going to be given. However, when he was asked by Lupo at the conclusion of the instruction conference whether it was "possible to get them [copies of the instructions]" prior to closing argument, the trial judge replied: "Well, you have the instructions as they were offered and I've indicated where the changes are going to be, and I've indicated that on all boiler-plate instructions I'm reserving the right to put them all in my own words anyhow. So, I don't have those available to give to you."

■ It is clear, however, that where the trial court informs the defendant of the instructions to be given, then "[a]bsent prejudice caused by surprise, a court is not obligated to furnish copies of its instructions before argument." *United States v. Isaacs,* 493 F.2d 1124, 1163 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974).

■ Lupo next contends that he was prejudiced by not being informed beforehand of the court's omission from one of the instructions of a sentence concerning the relationship of each witness to either party. We disagree, because this area was covered in another instruction by the court, which provided:

In reviewing the credibility of each witness, I ask you to consider the witness's interest or lack of interest in the result of this trial, the witness's conduct and demeanor on the witness stand, any bias or prejudice that may have been shown ... the possible motives for falsifying, and all other facts and circumstances appearing in this trial which tend to either support or discredit the testimony of each witness * * *.

Lupo was fully informed, prior to making his closing argument, of all the substantive provisions included in the jury instructions. No prejudice resulted from the trial court's failure to provide him with exact copies of the instructions.

*Sentencing*

■ In his final argument on appeal, Lupo contends that he was punished for exercising his right to trial. Lupo and Silseth (who pled guilty) were sentenced on the same day. Lupo received four and one-half years while Silseth received one year. At the sentencing, the trial judge noted that Silseth made the first step toward rehabilitation by pleading guilty. Based on this statement, Lupo contends that his sentence was made harsher because he went to trial.

Lupo concedes that the record contains evidence to justify the difference in sentences—namely, the fact that Lupo had a prior record and was the apparent source of the marijuana. Lupo also concedes that this case is indistinguishable from the situation in *United States v. Santiago*, 582 F.2d 1128, 1137 (7th Cir. 1978), wherein the court found that vacation of a sentence was not necessary "where the record showed that a sentence was imposed in a thoughtful and discriminating way." We believe that *Santiago* states the correct rule for this issue.

We find no prejudicial error in the sentencing under these circumstances.

Affirmed.