Arlie Glen SKELTON, Jr., et al.,
Plaintiffs-Appellees,

v.

GENERAL MOTORS CORPORATION,
Defendant-Appellant.

No. 80–2781.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 19, 1981.

Decided Sept. 28, 1981.

Rehearing and Rehearing En Banc
Denied Dec. 11, 1981.

---

William R. Jentes, Kirkland & Ellis, Chicago, Ill., for defendant-appellant.

Charles A. Boyle, William J. Harte, Abraham N. Goldman, Francis E. Goodman, Chicago, Ill., for plaintiffs-appellees.

Before SWYGERT, Senior Circuit Judge, and WOOD and CUDAHY, Circuit Judges.

CUDAHY, Circuit Judge.

Section 110(d) of Title I of the Magnuson-Moss Warranty-Federal Trade Commission Improvements Act ("Magnuson-Moss" or the "Act") creates a federal private cause of action for consumers damaged by the failure of a warrantor "to comply with any obligation under . . . a written warranty." 15 U.S.C. § 2310(d)(1) (1976). The issue on this interlocutory appeal is whether a "written warranty" actionable under § 110(d) is limited to the particular promises, undertakings or affirmations of fact expressly defined as "written warranties" by Congress in the Act. The district court held that § 110(d) provides a federal cause of action not merely for breach of a "written warranty" as defined in the Act but also for breach of "all written promises presented in connection with the sale of a formally warranted product." 500 F.Supp. 1181, 1190 (N.D.Ill.1980). We reverse.

## I.

Plaintiffs, purchasers of automobiles manufactured by defendant General Motors Corporation ("GM"), brought this action as a nationwide class action on behalf of all purchasers of GM automobiles manufactured from 1976 through 1979. In Count I of their amended complaint, plaintiffs allege that GM, through its "brochures, manuals, consumer advertising and other forms of communications to the public generally and to members of plaintiffs' class specifically," warranted and represented that 1976 through 1979 GM automobiles contained THM 350 (M38) transmissions, or "transmissions of similar quality and performance. . . . and that [such transmissions] would meet a specified level of performance." Plaintiffs charge in Count I that, contrary to these warranties and representations, GM substituted inferior THM 200

(M29) transmissions for THM 350 (M38) transmissions in GM automobiles manufactured from 1976 through 1979. This undisclosed substitution is alleged to constitute a violation of written and implied warranties under § 110(d) of Magnuson-Moss. In Count II, plaintiffs claim that the substitution is actionable as a "deceptive warranty" under § 110(c)(2) of the Act, 15 U.S.C. § 2310(c)(2) (1976).

General Motors moved to dismiss both counts of plaintiffs' complaint for failure to state a claim upon which relief could be granted. On October 1, 1980, the district court granted this motion with respect to the "implied warranty" portion of Count I and the "deceptive warranty" claim in Count II, but denied GM's motion to dismiss the "written warranty" claim in Count I. 500 F.Supp. 1181 (N.D.Ill.1980). GM's interlocutory appeal from the district court's refusal to dismiss the "written warranty" claim was certified by the district court on October 31, 1980 and accepted by this court on December 4, 1980. Plaintiffs did not take timely interlocutory appeals from the district court's determinations against them with respect to the "implied warranty" and "deceptive warranty" claims.[1]

## II.

Magnuson-Moss is, in the main, a remedial statute designed to protect consumers from deceptive warranty practices. Its

---

1. This case is related to the much-publicized "engine interchange" litigation, a consolidated class action brought against GM on behalf of all purchasers of 1977 Oldsmobile automobiles equipped with engines produced by GM's Chevrolet division. That litigation has been before this court twice on questions concerning, first, the district court's approval of a subclass settlement, *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106 (7th Cir.), cert. denied, 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979) and, second, the sufficiency of a notice which detailed an offer of settlement to individual subclass members, *Oswald v. McGarr*, 620 F.2d 1190 (7th Cir. 1980). Nothing in our opinions or in the district court's orders in that case, however, directly addresses the issue before us here—namely, whether a warranty of description of an automobile component is actionable as a "written warranty" under § 110(d) of Magnuson-Moss. In this regard, plaintiffs have referred us to the following paragraph from *In re General Motors Corp. Engine Interchange Litigation*:

> The trial court's findings contain no express discussion of the merits of the Magnuson-Moss claim. Indeed, with respect to the alleged transmission switch in Delta 88s, the court apparently misapprehended the nature of the objectors' claims. The court noted that all Delta 88 coupes and sedans contained the THM 200 regardless of whether they had Chevrolet or Oldsmobile engines. The gist of objectors' claim, as we understand it, is that the transmissions used simply were not those warranted. Thus, the fact that all Delta 88 sedan and coupe purchasers received the smaller transmission is irrelevant. If objectors' contention is correct, GM breached its warranty to all Delta purchasers, not just those who received Chevrolet engines.

594 F.2d at 1132 n.44. This statement, which does not purport to be dispositive of anything, is not part of our holding in that case. It has merely become part of the detritus of lawsuits.

We do not know why the issue before us now was not explicitly considered in the engine interchange litigation. It may be that it was not raised there (although plaintiffs suggest to the contrary). It may also be, as suggested by two commentators, that the engine switch was alleged in that case to be a breach of the implied warranty of merchantability, which is defined in U.C.C. § 2-314 as follows:

> (2) Goods to be merchantable must be at least such as
>
> (a) pass without objection in the trade under the contract description; and
>
> (b) in the case of fungible goods, are of fair average quality within the description; and
>
> (c) are fit for the ordinary purposes for which such goods are used; and
>
> (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
>
> (e) are adequately contained, packaged, and labeled as the agreement may require; and
>
> (f) conform to the promises or affirmations of fact made on the container or label if any.

See Miller and Kanter, *Litigation Under Magnuson-Moss: New Opportunities in Private Actions*, 13 U.C.C. L.J. 10, 14 (1980). *Cf. Fischbach & Moore Int'l Corp. v. Crane Barge R–14*, 476 F.Supp. 282, 287 (D.Md.1979) ("Where an affirmation of fact is made on a product or its container, an implied warranty arises that the product will conform to the representations.") We of course express no opinion concerning the district court's holding in this case that the transmission switch did not constitute a breach of implied warranty because plaintiffs' complaint did not "suggest that the cars were unfit for driving or below a minimally acceptable standard of quality." 500 F.Supp. at 1192.

draftsmen believed that consumer product warranties often were too complex to be understood, too varied to allow meaningful comparisons and too restricted to provide meaningful warranty protection. *See* S.Rep.No.93–151, 93d Cong., 1st Sess. 6–8 (1973); H.R.Rep.No.93–1107, 93d Cong., 2d Sess. 22–29, *reprinted in* [1974] U.S.Code Cong. & Ad.News 7702, 7705–11.[2] The Act's draftsmen sought to remedy these perceived ills by imposing extensive disclosure requirements and minimum content standards on particular types of written consumer product warranties. And, to promote enforcement of these warranties, the draftsmen devised a detailed remedial apparatus, which includes optional informal dispute settlement procedures as well as private and governmental judicial actions.

Although Magnuson-Moss does not require any manufacturer or seller to extend a warranty with its product,[3] any "written warranty" offered with a consumer product is subject to the Act's regulatory requirements. The term "written warranty" is defined "for purposes of [the Act]" in § 101(6) which reads:

(6) The term written warranty means—
  (A) any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or
  (B) any undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking.
which written affirmation, promise, or undertaking becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product.

15 U.S.C. § 2301(6) (1976).

Sections 102 through 109 of the Act set forth the content and disclosure rules applicable to all "written warranties." Section 102 provides that "any warrantor warranting a consumer product to a consumer by means of a written warranty shall, to the extent required by the rules of the [Federal Trade] Commission, fully and conspicuously disclose in simple and readily understood language the terms and conditions of such warranty." 15 U.S.C. § 2302(a) (1976). Pursuant to this provision, the FTC has, by regulation, required that warrantors made detailed disclosures of information necessary to allow consumers to understand and enforce written warranties.[4] The FTC reg-

---

**2.** The Report of the House Committee on Interstate and Foreign Commerce states a particular concern that appeared recurrently in legislative discussions of the Act:

> [T]he paper with the filigree border bearing the bold caption 'Warranty' or 'Guarantee' was often of no greater worth than the paper it was printed on. Indeed, in many cases where a warranty or guarantee was ostensibly given the old saying applied 'The bold print giveth and the fine print taketh away.' For the paper operated to take away from the consumer the implied warranties of merchantibility and fitness arising by operation of law leaving little in its stead.

H.R.Rep.No.93–1107, 93d Cong., 2d Sess. 13, *reprinted in* [1974] U.S.Code Cong. & Ad.News 7706.

**3.** Not only does the Act not require the provision of warranties of any kind, it also bars the FTC from so requiring as well, in § 102(b)(2),

which reads: "Nothing in this title . . . shall be deemed to authorize the Commission . . . to require that a consumer product or any of its components be warranted." 15 U.S.C. § 2302(b)(2) (1976).

**4.** This regulation reads:

Any warrantor warranting to a consumer by means of a written warranty a consumer product actually costing the consumer more than $15.00 shall clearly and conspicuously disclose in a single document in simple and readily understood language, the following items of information:

(1) The identity of the party or parties to whom the written warranty is extended, if the enforceability of the written warranty is limited to the original consumer purchaser or is otherwise limited to persons other than every consumer owner during the term of the warranty;

(2) A clear description and identification of products, or parts, or characteristics, or com-

ulations also require, pursuant to § 102(b), that sellers of consumer products with written warranties make available to the consumer the text of such warranties prior to sale. 16 C.F.R. § 702.3 (1980).

Under § 103, warrantors must conspicuously designate written warranties as either "full" or "limited." If a warranty is designated as "full," § 104 provides that the warrantor must (1) remedy defects or malfunctions without charge and within a reasonable period of time; (2) make no limitation on the duration of any implied warranty on the product; (3) provide for no exclusion of limitation of consequential damages unless conspicuously stated, and (4) refund or replace the product if, after a reasonable number of attempted repairs, the supplier

fails to remedy defects or malfunctions. 15 U.S.C. § 2304 (1976).

An additional obligation placed on suppliers extending written warranties is found in § 108, which provides that such suppliers may not disclaim, modify or limit the duration of implied warranties to a period shorter than the "duration of a written warranty of reasonable duration." 15 U.S.C. § 2308 (1976).[5]

Section 110(d) creates a private cause of action for breach of "written warranty," subject to the requirements that: (1) the consumer must have an individual claim of at least $25; (2) the total amount in controversy must equal or exceed $50,000; and (3) if brought as a class action, the complaint must name at least one hundred plaintiffs. 15 U.S.C. § 2310(d)(3) (1976).[6] Section 110

---

ponents or properties covered by and where necessary for clarification, excluded from the warranty;

(3) A statement of what the warrantor will do in the event of a defect, malfunction or failure to conform with the written warranty, including the items or services the warrantor will pay for or provide, and, where necessary for clarification, those which the warrantor will not pay for or provide;

(4) The point in time or event on which the warranty term commences, if different from the purchase date, and the time period or other measurement of warranty duration;

(5) A step-by-step explanation of the procedure which the consumer should follow in order to obtain performance of any warranty obligation, including the persons or class of persons authorized to perform warranty obligations. This includes the name(s) of the warrantor(s), together with: the mailing address(es) of the warrantor(s); and/or the name or title and the address of any employee or department of the warrantor responsible for the performance of warranty obligations, and/or a telephone number which consumers may use without charge to obtain information on warranty performance;

(6) Information respecting the availability of any informal dispute settlement mechanism elected by the warrantor in compliance with Part 703 of this subchapter;

(7) Any limitations on the duration of implied warranties, disclosed on the face of the warranty as provided in Section 108 of the Act, accompanied by the following statement:

Some states do not allow limitations on how long an implied warranty lasts, so the above limitation may not apply to you.

(8) Any exclusions of or limitations on relief such as incidental or consequential damages,

accompanied by the following statement, which may be combined with the statement required in paragraph (a)(7) of this section:

Some states do not allow the exclusion or limitation of incidental or consequential damages, so the above limitation or exclusion may not apply to you.

(9) A statement in the following language:

This warranty gives you specific legal rights, and you may also have other rights which vary from state to state.

16 C.F.R. § 701.3(a) (1980).

5. Any such limitation must be "conscionable and . . . set forth in clear and unmistakable language and prominently displayed on the face of the warranty." 15 U.S.C. § 2308(b) (1976). The FTC has interpreted the phrase "on the face of the warranty" to mean:

(1) Where the warranty is a single sheet with printing on both sides of the sheet or where the warranty is comprised of more than one sheet, the page in which the warranty text begins;

(2) Where the warranty is included as part of a larger document, such as a use and care manual, the page in such document on which the warranty text begins.

16 C.F.R. § 701.1(i) (1980).

6. Additionally, if a supplier has established an internal dispute settlement procedure pursuant to § 110(a), the consumer generally may not commence an action under § 110(d) without first having resorted to the established procedure. 15 U.S.C. § 2310(a)(3) (1976). The minimum requirements for any informal dispute settlement procedure created pursuant to § 110(a) are set forth at 16 C.F.R. § 703 (1980).

also makes any failure to comply with the requirements of the Act a violation of § 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1) (1976)), and empowers the FTC and the Attorney General to seek injunctive relief against (1) failure to comply with any obligation under the Act, and (2) written warranties which may be "deceptive" to a reasonable individual. 15 U.S.C. § 2310(c) (1976).

### III.

The scope of the private action for breach of "written warranty" created by § 110(d) is the issue presented to us for resolution.[7] Section 110(d) provides in part that:

[A] consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this title, or a written warranty,

implied warranty, or service contract, may bring suit for damages and other legal and equitable relief [in any state court of competent jurisdiction or in an appropriate federal district court].

15 U.S.C. § 2310(d)(1) (1976).

■ The district court properly rejected plaintiffs' argument that the Act's draftsmen intended in § 110(d) to create a federal private cause of action for breach of all written express warranties.[8] None of the legislative history offered by plaintiffs in this record provides the clear evidence of Congressional intent necessary to overcome the "familiar principle governing the interpretation of statutes . . . that if a statutory definition of a word is given, that definition must prevail, regardless of what other meaning may be attributable to the word."

---

**7.** Plaintiffs' complaint alleged that GM had warranted that its automobiles contained THM 350 (M38) transmissions, or "transmissions of similar quality and performance . . . and that [such transmissions] would meet a specified level of performance." The district court concluded that such a warranty did not fall within the § 101(6) definition of "written warranty," because it did not affirm that the transmission would "meet a specified level of performance *over a specified period of time.*" 15 U.S.C. § 2301(6) (1976) (emphasis added). *See* 500 F.Supp. at 1185–86. This conclusion is consistent with the FTC's interpretation of § 101(6), which is set forth in its regulations at 16 C.F.R. § 700.3(a) (1980):

The Act imposes specific duties and liabilities on suppliers who offer written warranties on consumer products. Certain representations, such as energy efficiency ratings for electrical appliances, care labeling of wearing apparel, and other product information disclosures may be express warranties under the Uniform Commercial Code. However, these disclosures alone are not written warranties under this Act. Section 101(6) provides that a written affirmation of fact or a written promise of a specified level of performance must relate to a specified period of time in order to be considered a "written warranty." A product information disclosure without a specified time period to which the disclosure relates is therefore not a written warranty.

The district court noted that, by this reading of § 101(6), a representation that a "transmission would perform like a THM 350 transmission for the life of the transmission" would constitute a "written warranty," while the representation that a "transmission would perform

like a THM 350 transmission" does not. The arbitrariness of this distinction is apparent, but a certain amount of arbitrariness is inevitable whenever a bright line must be drawn. And the need for a clearly circumscribed definition in the statutory scheme before us is apparent since, to comply with the Act's obligations, manufacturers and suppliers must know in advance exactly which representations are subject to those obligations. Moreover, it is quite plausible that the Act's draftsmen defined "written warranty" in § 101(6) so as to exclude general descriptions of consumer products or their components from the reach of the Act, since it would be excessively cumbersome to impose the Act's disclosure rules on every advertisement containing a description of a product or its components. On this appeal, plaintiffs do not challenge the district court's conclusion that the warranties described in their complaint are not within the § 101(6) definition. 500 F.Supp. at 1185–86.

**8.** The Uniform Commercial Code, § 2–313 defines "express warranty" to mean:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

*Evans v. Int'l Typographical Union*, 76 F.Supp. 881, 887 (S.D.Ind.1948).[9] Indeed, we are less than confident that it is possible to distill any unambiguous Congressional intent from the Act's legislative history. As the district court noted:

[A review of the Act's legislative history] is the legal equivalent of an archaeological dig. Various consumer warranty bills were pending before the House and Senate for four years, during which each body defined, discarded, reintroduced and redefined concepts which in some fashion or another are related to the enacted legislation. Some provisions of the Act are vestigial reminders of concepts buried but not totally forgotten during the ongoing legislative process. Both proponents and opponents of an expansive interpretation have cited compelling, to them, legislative history only dimly related to the language which finally emerged as law.

500 F.Supp. at 1184.

In support of their argument that § 110(d) created a federal private cause of action for breach of all written express warranties, plaintiffs rely heavily on the fact that the version of § 110 passed by the Senate and submitted to Conference had both defined "express warranty" and created a cause of action for breach of any express or implied warranty.[10] But the Conference rejected the Senate approach, and the version of § 110 enacted into law was adopted substantially verbatim from

9. Of course, it is inappropriate to blindly adhere to a statutory definition if such adherence would frustrate clearly expressed legislative intent. Thus, in *United States v. Walton*, 514 F.2d 201, (D.C.Cir.1975), the court rejected defendant's argument that the statutory definition of marijuana should prevail in a prosecution for unlawful distribution of marijuana under the Controlled Substances Act of 1970. Finding that the "legislative history is absolutely clear that Congress meant to outlaw all plants popularly known as marijuana to the extent those plants possess THC." 514 F.2d at 203–04, the court held that the term "marijuana" as used in the Act included all species of cannibus containing THC, even though the statute defined marijuana as cannibus sativa L., which, arguably, was only one of several known species of cannibus containing THC. *Accord, United States v. Lupo*, 652 F.2d 723 (7th Cir. 1981); *United States v. Kelly*, 527 F.2d 961 (9th Cir. 1976); *United States v. Gavic*, 520 F.2d 1346 (8th Cir. 1975).

As a rule, however, there should be a strong presumption that a statutory term means what it is defined to mean, because, by the very act of including a definition in the statute, the statute's draftsmen have made a considered determination of the appropriate meaning of that term for the purposes of the particular statutory scheme they have created. Nothing offered by the plaintiffs is sufficient to suggest that Congress did not intend for the definition it ascribed to "written warranty" for purposes of the Act in § 101(6) not to apply to the phrase "written warranty" in § 110(d).

10. The Senate version of § 110 provided in part:

(b) Any purchaser damaged by the failure of a supplier to comply with any obligations assumed under a written warranty or service contract in writing subject to this title may bring suit for breach of such warranty or service contract in an appropriate district court of the United States subject to the jurisdictional requirements of section 1331 of title 28, United States Code. Any purchaser damaged by the failure of a supplier to comply with any obligations assumed under an express or implied warranty or service contract subject to this title may bring suit in any State or District of Columbia court of competent jurisdiction....

(c) Any purchaser who shall finally prevail in any suit or proceeding for breach of an express or implied warranty or service contract brought under section (b) of this section shall be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses (including attorneys' fees based on actual time expended) determined by the court to have been reasonably incurred by such purchaser for or in connection with the institution and prosecution of such suit or proceeding, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate.

(d)(1) For the purposes of this section, an "express warranty" is created as follows:

(A) Any affirmation of fact or promise made by a supplier to the purchaser which relates to a consumer product or service and becomes part of the basis of the bargain creates an express warranty that the consumer product or service shall conform to the affirmation or promise.

(B) Any description of a consumer product which is made part of the bargain creates an express warranty that the consumer product shall conform to the description.

119 Cong.Rec. 29491–92 (1973).

the House bill, which had neither defined "express warranty" nor provided a cause of action for its breach.[11] The House version of the Act created instead a cause of action for failure to comply with "any obligation under [the Act], or under a warranty or service contract (as defined in section 10(10) and (11))."[12] The Conference Committee modified this language by substituting for the word "warranty," the term "written warranty," which the Conference Committee had newly defined in § 101(6).[13]

It is also significant to note that the limitations imposed on federal jurisdiction by the Senate version of § 110, which plaintiffs view as expansive, were actually stricter than those imposed by the House bill. The Senate bill did not create a cause of action cognizable in federal court for breach of express warranties; instead, it apparently operated only to provide for recovery of attorneys' fees by consumers who prevailed in actions for breach of express warranties in *state court*. And, because it incorporated the $10,000 amount in controversy requirement of 28 U.S.C. § 1331 (1976), few, if any, actions could have been brought in federal

court under the Senate version of the Act.[14] As the Report of the Senate Committee on Commerce explained:

> Subsection (b) authorizes any "consumer" . . . to sue for breach of warranty or service contract in an appropriate district court, but any such suit shall be subject to the jurisdictional requirements of section 1331 of title 28 of the United States Code. In effect, this means a person or at this time a class of persons must show individual damages of ten thousand dollars or more in order to bring suit in a Federal court.
>
> But any 'consumer' damaged by the failure of a supplier to comply with any obligations assumed under an express or implied warranty or service contract subject to this title—i. e. a warranty in writing, a service contract in writing, an express warranty . . . or implied warranties—may sue in any State or District of Columbia court of competent jurisdiction. Thus, for the most part, the Federal rights created by title I of this bill will be enforced in State rather than Federal courts.

**11.** The House version of § 110 provided in part: [A] consumer who is damaged by the failure of a supplier to comply with any obligation under this title, or under a warranty or service contract (as defined in section 101(10) and (11)), may bring suit [in any state court of competent jurisdiction or in an appropriate federal district court]. (2) If a consumer finally prevails in any action brought under paragraph (1) of this subsection, he may be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses (including attorneys' fees based on actual time expended) determined by the court to have been reasonably incurred by the plaintiff for or in connection with the institution and prosecution of such action, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate. 120 Cong.Rec. 31729 (1974).

**12.** "Warranty" was defined in the House bill to include implied warranties as well as those warranties ultimately defined as "written warranties" in § 101(6). *See* note 19, *infra*.

**13.** The House bill had not defined "written warranty," and the definition contained in the Sen-

ate bill was aptly described by the district court as a "lesson in statutory indirection." 500 F.Supp. at 1188 n.17. Section 101(8) of the Senate bill first defined a "[w]arranty in writing 'or written warranty'" as "a warranty in writing against defect or malfunction of a consumer product." Section 101(11) then defined "warranty in writing against defect or malfunction of a consumer product" in essentially the same way as the final version of the Act defined "written warranty." 119 Cong.Rec. 29490 (1974).

**14.** Under then-applicable law, for a proposed class action to have satisfied the amount in controversy requirement of 28 U.S.C. § 1331 (1976), each member of the class must have had an individual claim in excess of $10,000. *Zahn v. Int'l Paper Co.*, 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973). It appears unlikely that either this proposed class action or the engine interchange class action would have met this stringent amount in controversy requirement. We note that Congress amended 28 U.S.C. § 1331 (1976) in 1980 to eliminate the minimum amount in controversy requirement. Pub.L. 96–486, § 2(a), 94 Stat. 2369 (1980).

S.Rep.No.93–151, 93rd Cong., 1st Sess. 23 (1973).[15] Thus, although the Senate bill defined "express warranty" and in some manner created a federal claim for breach of such warranties, it limited the jurisdiction of *federal courts* to actions alleging breach of "written warranties," as that term was defined in § 101 of the Act.

██ Therefore, in arguing that § 110(d) provides consumers with a claim actionable in federal court for breach of any written express warranty, plaintiffs argue for a construction of § 110(d) that was not contemplated by either the House or the Senate.[16] It is inconceivable that, by deleting any reference to "express warranty" from the Act, and by providing instead a cause of action for breach of "written warranty" (which the Conference Committee had newly defined in § 101(6)), the Committee could have meant to create a private remedy actionable in federal court for breach of all written express warranties, when neither the Senate nor the House had so provided.[17]

**15.** In contrast to the Senate version of § 110, the federal jurisdictional provision of the House bill, which was adopted by the Conference, required only that each individual claim be greater than $25, although the amount in controversy in the aggregate must exceed $50,000. In addition, if the action is brought as a class action, at least 100 plaintiffs must be named. 15 U.S.C. § 2310(d)(3) (1976). The House Report stated that the purpose of these jurisdictional requirements "is to avoid trivial or insignificant actions being brought as class actions in the federal courts." H.R.Rep.No.93–1107, 93d Cong., 2d Sess., *reprinted in* [1974] U.S. Code Cong. and Ad.News 7724. Absent these requirements, actions could have been brought in federal court under the Act without regard to the amount in controversy. *See* 28 U.S.C. § 1337 (1976); *Novosel v. Northway Motor Car Corp.*, 460 F.Supp. 541 (N.D.N.Y.1978). Thus, the federal jurisdictional requirements of the Act, although less severe than those initially adopted by the Senate, evince an intent to limit the private remedy in federal court.

**16.** The single legislative statement cited by plaintiffs which bears directly on the issue before us is found in a single paragraph of the House Conference Report:
*Remedies for breach of express warranties not in writing*
The Senate bill afforded reasonable attorney's fees to a consumer who successfully sued for the breach of an express oral warranty. The House amendment did not provide reasonable attorney's fees in that situation. The conferees adopted the House approach, but stated that they would reexamine the issue if oral express warranties became more prevalent.
Joint Explanatory Statements of the Committee of Conference, S.Conf.Rep.No.93–1408 and H.R.Conf.Rep.93–1606, 93rd Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. and Ad. News 7755, 7758.
Plaintiffs argue that this language indicates that "there was no intention of the Conference Committee to restrict the range of written representations actionable under Section 110(d)(1)." We disagree. The negative inference urged by plaintiffs is simply too attenuated to provide the clear evidence of contrary intent necessary to override the specific language of the statute. *See Zychinski v. Commissioner*, 506 F.2d 637, 639 (8th Cir. 1974), cert. denied, 421 U.S. 999, 95 S.Ct. 2397, 44 L.Ed.2d 666 (1975); *Luckman v. Commissioner*, 418 F.2d 381, 387 (7th Cir. 1969).

Moreover, this paragraph must be read in light of the fact that neither the Senate nor the House versions of § 110(d) had provided that all written express warranties would be actionable in federal court. The Senate bill had provided for recovery of attorneys' fees by consumers who prevailed in *state court* actions for breach of any express or implied warranty. The House bill, as the Conference Report correctly stated, did not provide attorneys' fees in actions for breach of oral express warranties. *See* note 11, *supra*. It would also have been correct for the Report to note that the House bill had created a federal cause of action and provided attorneys' fees only for consumers damaged by breach of those warranties defined in § 101(10) of the bill. *Id.* But the failure of the Report to so note does not support the conclusion that the Conference Committee, in adopting the House approach, intended to do something that neither the House nor the Senate had contemplated, i. e., create a cause of action cognizable in federal court for breach of any written express warranty.

**17.** Plaintiffs have referred us to portions of an *amicus* brief filed with the court in the Engine Interchange Litigation by Senator Magnuson and Representative Moss. Of course, such post-passage remarks of legislators are of negligible value in ascertaining the intent of Congress in passing the Act. *Blanchette v. Conn. General Ins. Corp.*, 419 U.S. 102, 132, 95 S.Ct. 335, 352, 42 L.Ed.2d 320 (1974). It is interesting to note, however, that the Act's sponsors, in urging that GM's undisclosed substitution of Chevrolet engines in Oldsmobile automobiles constituted a breach of a written warranty under § 110(d), did not argue that § 110(d) created a federal cause of action for breach of warranties of description (or other written express

In sum, there is simply no substantial evidence in the legislative history that Congress intended to create a broad federal cause of action for breach of written express warranties. Rather, it appears that the draftsmen of § 110(d) intended to adopt the House approach, which was to create a federal private cause of action for consumers injured by the violation of (1) any obligation under the Act, (2) any warranty subject to the extensive regulatory requirements of the Act, or (3) any implied warranty—the deceptive and unconscionable limitation of which was a major focus of the Act's regulatory provisions.

## IV.

■ Although the district court properly declined to adopt plaintiffs' interpretation of § 110(d), it also rejected GM's argument that the only written warranties actionable under § 110(d) are those promises, representations or undertakings defined as "written warranties" in § 101(6). In its view:

> Congress . . . indicated that although the Magnuson-Moss Act only regulates transactions involving written warranties as the term is narrowly defined in § 101(6), once a consumer is involved in such a transaction there is a policy of providing federal remedies beyond the four corners of the formal warranty.

500 F.Supp. at 1191. Thus, the district court concluded that, whenever a manufacturer elects to extend a "written warranty" to a consumer, "[o]ther written promises presented in connection with the same transaction should also be enforceable as part of the 'written warranty.'" 500 F.Supp. at 1190.

The district court's determination that "written warranty" in § 110(d) means something more than it was defined to mean in § 101(6) has two aspects. First, the court found that the "Act itself suggests several different possible meanings of the phrase 'written warranty'" and is therefore ambiguous. 500 F.Supp. at 1187. Second, because of this ambiguity, the district court looked to the purposes of the Act, as derived from its legislative history, and concluded that § 110(d) should be construed to provide "a remedy for all written promises presented in connection with the sale of a formally warranted product." 500 F.Supp. at 1190.

We believe that the three ambiguities identified by the district court, which we shall consider individually, are not sufficiently real or substantial to warrant rejection of the definition of "written warranty" provided by Congress in the Act. Moreover, as already discussed, we do not find in the Act's legislative history a clear Congressional intention that the term "written warranty" was meant to have different meanings in different sections of the Act. *See* Part III, *supra*. And, if anything is apparent from the statutory scheme, it is the importance of providing a clear, carefully circumscribed meaning to the term "written warranty." *See* note 7, *supra*.

One ambiguity in the use of the term "written warranty" which was identified by the district court appears in § 103(b). That subsection provides that the Act's content and disclosure requirements "shall not apply to statements or representations which are similar to expressions of general policy concerning consumer satisfaction and which are not subject to any specific limitations." 15 U.S.C. § 2303(b) (1976). The district court concluded that this provision would be "unnecessary" if the § 101(6) definition was intended to apply throughout the Act, presumably because, in the view of the district court, the generalized representations described in § 103(b) could never fall within the § 101(6) definition and were therefore statements or representations of a sort other than those defined in § 101(6). We cannot accept this supposition, however, because it is possible to construe these generalized representations to fit within the § 101(6) definition in some cases. For ex-

---

warranties not within the § 101(6) definition). Rather, they argued that the representations made by GM constituted "written warranties" within the meaning of § 101(6). The plaintiffs

do not argue on appeal for such an interpretation under the similar circumstances of this case, and the district court specifically rejected such a construction. *See* note 7, *supra*.

ample, a written statement that "your money will be refunded if you are not completely satisfied" might be deemed to constitute an "undertaking in writing in connection with the sale by a supplier of a consumer product to refund ... in the event that such product fails to meet the specifications set forth in the undertaking," *i. e.*, complete satisfaction. 15 U.S.C. § 2301(6)(B) (1976). Section 103(b) may quite plausibly have been included in the Act precisely to foreclose such interpretations.[18]

A second ambiguity identified by the district court concerns § 110(c)(2)(B), which provides that a "deceptive warranty" includes a "written warranty created by the use of such terms as 'guaranty' or 'warranty,' if the terms and conditions of such warranty so limit its scope and application as to deceive a reasonable individual." 15 U.S.C. § 2310(c)(2)(B) (1976). The district court concluded that this "apparently" means that "a written warranty can be 'created' by the use or misuse of the words 'guaranty' or 'warranty,' even if the document using these terms does not include representations which constitute warranties under § 101(6)." 500 F.Supp. at 1187–88. Although the district court offers a sensible reading of § 110(c)(2)(B), its interpretation is not by any means required by the language of that section, and the interpretation is without support in the legislative history. The deceptive warranty provision was taken largely verbatim from the House version of the Act, which defined "decep-

tive warranty" to mean, *inter alia*, "a warranty (as so defined [in section 101(10)])[19] created by the use of such terms as 'guaranty' or 'warranty' ..." Thus, while the draftsmen's diction may have been suspect (insofar as they used the phrase "created by the use of" instead of "including" or "containing"), it appears most plausible that they intended for the term "deceptive warranty" to mean a written warranty *as defined in § 101(6)*, which contains such terms as "guaranty" or "warranty," if the warranty's terms and conditions "so limit its scope and application as to deceive a reasonable individual." 15 U.S.C. § 2310(d) (1976). *See also* C. Reitz, Consumer Protection Under the Magnuson-Moss Warranty Act 77 (1978).

The district court also found an inconsistency between the § 101(6) definition of "written warranty" as a particular type of promise, affirmation or undertaking, and § 102, which "authorizes the Federal Trade Commission to promulgate rules requiring 'inclusion *in the written warranty*' of various explanations of the rights of the consumer, including such statements as a 'brief, general description of the legal remedies available to the consumer.'" 500 F.Supp. at 1187 (emphasis in original). From this, the district court concluded that "in the written warranty" suggests that "[a] written warranty is not just a particular type of 'promise' or 'affirmation' but a type of document or written contract as well." *Id.* In its brief on appeal, GM simi-

---

**18.** In its regulations, the FTC describes § 103(b) as creating an "exemption" from the requirements of §§ 102–104. 16 C.F.R. § 700.5(b) (1980). This description strongly suggests that the FTC also perceives that at least some of the generalized statements exempted by § 102(b) might otherwise fall within the § 101(6) definition, since the same regulation unambiguously states that the duties and liabilities of the Act are imposed only on those suppliers who offer "written warranties" as defined in § 101(6). *See* 16 C.F.R. § 700.3(a) (1980) (quoted in note 6, *supra*).

**19.** Section 101(10) of the House version of the Act defined "warranty" to mean:

(A)(i) any written affirmation of fact or written promise made at the time of sale by a supplier to a purchaser which relates to the

nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or

(ii) any undertaking in writing in connection with the sale of a consumer product to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking, which written affirmation, promise, or undertaking becomes part of the basis of the bargain between a supplier and the first buyer at retail of such product; or

(B) an implied warranty arising under State law.

120 Cong.Rec. 31727 (1974).

larly stated that a " 'written warranty' can be both a particular type of written promise or affirmation *and* the document incorporating it."

The text of a "written warranty" must, in the nature of things, be written *on* something. And, to this extent, a written warranty as defined in § 101(6) might be described as a written document. But there is nothing in the scheme of the statute to suggest that the Act was intended to apply to any promises, affirmations or undertakings other than those defined as written warranties in § 101(6). And we ought not to take a leap of faith to a documentary definition allegedly suggested by the seemingly inapt phrasing of § 102. As already noted, it is apparent from the statutory scheme that "written warranty" should be accorded a single, precise meaning. Moreover, we are constrained by sensible rules of statutory construction to interpret the phrase "written warranty" in § 102, as in the other sections of the statute, to be consistent with the clear meaning given to it by § 101(6). As stated in *United States v. Gertz*, 249 F.2d 662, 665 (9th Cir. 1957):

> [W]here the same word or phrase is used in different parts of a statute, it will be presumed, in the absence of anything clearly indicating a contrary intent, that the word or phrase is used in the same sense throughout. Under circumstances giving application to this rule, there is a corollary that, where the meaning of the word or phrase in one instance is clear, this meaning will be attached to it elsewhere.

*Accord, Hotel Equities Corp. v. Commissioner*, 546 F.2d 725, 728 (7th Cir. 1976); *Dragstrem v. Obermeyer*, 549 F.2d 20, 24 n.4 (7th Cir. 1977). *See also Nachman Corp. v. Pension Benefit Guaranty Corp.*, 592 F.2d

947, 952–53 n.6 (7th Cir. 1979), *aff'd*, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980).

There is no clear evidence that Congress intended for written warranty in § 102 to mean something different than the definition it ascribed to the term in § 101(6), and we consequently presume that Congress intended for "written warranty" to have the same meaning in both sections. We therefore decline to accept the position that "written warranty" means both a particular class of representations and some undefined "document" containing those representations. It is more appropriate to read the inconsistent phrase "inclusion *in* the written warranty" [emphasis supplied] to mean "inclusion *with* the written warranty" or "inclusion in *the document containing* the written warranty." [20]

The term "written warranty" serves a central function in the Act of identifying the particular representations that are subject to the Act's disclosure and content requirements. Because of the function it serves, it is important that the term have a single, precise meaning. The § 101(6) definition provides that unambiguous meaning, and that definition is used (all things considered) with commendable aptness by the draftsmen in the forty-odd appearances of the term "written warranty" in every section of the Act. We cannot agree that syntactical slips such as the use of the preposition "in" in § 102, create ambiguities in the statutory scheme of sufficient weight to justify discarding the meticulously worded definition of "written warranty" in § 101(6) in favor of an undefined "document," or "pile of written documents," as urged by the district court. *See* 500 F.Supp. at 1190. [21]

---

**20.** The regulation adopted by the FTC pursuant to § 102 supports this construction, since it requires clear and conspicuous disclosure "in a single document" (in contrast to "in the written warranty") of the items of information required by § 102. *See* note 4, *supra*. Similarly, in defining "on the face of the warranty," the FTC distinguished between the "text of the warranty" and the document containing it. *See* note 5, *supra*.

**21.** Moreover, the legislative history of the Act, which the district court describes as "puzzling," 500 F.Supp. at 1188, offers no basis for the district court's rejection of the § 101(6) definition. Most of the very general legislative statements cited by the district court were made in reference to the Senate version of § 110, which, as set forth above, provided attorneys' fees for consumers who prevailed in state court actions for breach of any express or im-

## V.

In sum, we are constrained to interpret "written warranty" in § 110(d) in accordance with the definition of "written warranty" provided by Congress in § 101(6).

REVERSED.

HARLINGTON WOOD, Jr., Circuit Judge, dissenting.

This is a close case of statutory interpretation, but I respectfully dissent from the majority's conclusion that the Act must be so strictly and rigidly read as to exclude coverage of the alleged transmission substitution by General Motors.

Judge Moran, in the trial court, carefully pondered the arguments and concluded that the act was broader than General Motors argued, but not so broad as plaintiffs' urged.[1] I generally agree with his interpretation.

As Judge Moran noted, 500 F.Supp. at 1184, he was not the first one to have some difficulty interpreting the Act. Others before him have characterized it as serving as no exemplar of legislative clarity. I would, therefore, not begin and end by viewing the Act's definition provisions in such isolation as to conclude that the beneficial consumer protection purposes of the Act are thereby completely limited. Were this a criminal statute, I might be bound to resolve the question in favor of General Motors, but it is not.

This Act needs some limited judicial first aid in order to be able to accomplish its remedial purposes.[2] Therefore, I would interpret the Act to mean that those written documents of General Motors which made specific representations of substance about the product, not just advertising ballyhoo, and which were introduced by General Motors into the transaction became, as a practical matter, inferentially incorporated into the written warranty. The written warranty would then more fully deserve its gold filigree frame.

---

plied warranty. *See* Part III, *supra.* There is simply no clear evidence that Congress, in enacting the House version of § 110(d), intended to create a federal claim for breach of representations not within the § 101(6) definition of "written warranty."

The reports and proceedings of legislative bodies unquestionably lend themselves to the imagery of archaeology. But for better or worse, the papyrus scrolls or cuneiform tablets which survive such proceedings must count for more than the odd-shaped rocks, human skulls and miscellaneous artifacts scattered around the site. In its "archaeological dig" into legislative history, the district court tended to overlook the obvious but prosaic in favor of exotic "ambiguities" attributable more easily to drafting fatigue than to confusion of purpose.

1. Judge Moran's decision is reported at 500 F.Supp. 1181 (N.D.Ill.1980).

2. *See United States v. American Trucking Associations*, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940): "[E]ven when the plain meaning [of the statute] did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words." (Footnotes omitted.) For one of the earliest statements of the applicable principles of statutory construction, *see Heydon's Case*, 30 Co. 7a, 76 Eng.Rep. 637 (Exchequer 1584): "[F]or the sure and true interpretation of all statutes in general (be they penal or beneficial, restrictive or enlarging of the common law,) [among the] four things [which] are to be discerned and considered [is]: ... 4th. The true reason of the remedy, and then the office of all the Judges is always to make such construction as shall suppress the mischief [at which the statute is aimed], and advance the remedy, and *to suppress subtle inventions and evasions for continuance of the mischief ...* and to add force and life *to the cure and remedy,* according to the true intent of the makers of the Act...." (Emphasis added.) *See generally* W. Hurst, Statutes In Court 142, 184–201 (1970).